1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| T-MOBILE USA, INC., a Delaware corporation,<br><br>             Plaintiff,<br><br>     v.<br><br>HUAWEI DEVICE USA, INC., a Texas corporation; and HUAWEI TECHNOLOGIES CO. LTD, a China company,<br><br>           Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS ACT, BREACH OF CONTRACT, INTERFERENCE WITH BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT**<br><br>**JURY DEMAND** |

Plaintiff T-Mobile USA, Inc. ("T-Mobile") brings this action against Defendants Huawei Device USA, Inc. ("Huawei USA") and Huawei Technologies Co. LTD ("Huawei China") (collectively "Huawei") for theft of trade secrets, breaches of confidentiality and nondisclosure agreements, and additional violations that impact the public interest.

## I.     INTRODUCTION

1.     At its own expense, and with great ingenuity and effort, T-Mobile over the course of several years internally developed and refined a testing robot that has dramatically improved diagnosis and quality control for mobile phone handsets.  T-Mobile has carefully guarded the testing robot in order to protect the trade secrets behind the robot itself, its component parts and specifications, its software, and its functionality.

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS
ACT, BREACH OF CONTRACT, INTERFERENCE WITH
BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON
CONSUMER PROTECTION ACT - 1

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

2.     Huawei has stolen that technology.  It used that stolen technology to develop and improve its own testing robot, which it uses for its own benefit.  Huawei abused its relationship as a phone handset supplier for T-Mobile to obtain access to T-Mobile's robot and, in violation of several confidentiality and nondisclosure agreements, copied the robot's specifications and stole parts, software, and other trade secrets.

3.     After stealing T-Mobile's technology, employees of Huawei tried to conceal their theft, but were caught on camera and discovered by other means.  Huawei initially tried to cover up its actions, but ultimately admitted that its employees misappropriated parts and information about T-Mobile's robot in coordination with Huawei R&D so that Huawei could build and improve its own testing robot.

4.     As a result, T-Mobile is entitled to enjoin Huawei from using this stolen technology and from using and selling devices that benefit from this stolen technology.  On information and belief, Huawei's wrongful use of this stolen technology is ongoing.  Because of Huawei's material breach of the parties' agreements, T-Mobile was forced to cancel planned Huawei handset purchases and is therefore also entitled to the costs and consequential damages of replacing Huawei as an ongoing supplier of handsets in T-Mobile's product line – a cost that is at least tens of millions of dollars.  T-Mobile is additionally entitled to the actual damages it has suffered and any of Huawei's unjust gains from its theft of T-Mobile's valuable and innovative technology – gains that are currently estimated to benefit Huawei by hundreds of millions of dollars.

## II.     BACKGROUND

5.     T-Mobile is one of the largest wireless network operators in the United States.  With a network that reaches ninety-six percent of Americans, and a customer base of approximately fifty million, T-Mobile prides itself on the quality of its service and products.

6.     Part of T-Mobile's business involves supplying affordable, high quality, and reliable handsets to customers who use its network.  T-Mobile does not directly develop and manufacture the handsets itself.  Rather, potential suppliers submit proposals to T-Mobile in a

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS
ACT, BREACH OF CONTRACT, INTERFERENCE WITH
BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON
CONSUMER PROTECTION ACT - 2

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

competitive RFP process.  Huawei is one of these suppliers.  For the last several years, T-Mobile selected Huawei to supply phone handsets for particular segments of T-Mobile's customer base.  In selecting Huawei's handsets, T-Mobile passed over devices offered by several other potential suppliers.

7.      The handset supply process does not end when T-Mobile selects the particular handsets it plans to use.  T-Mobile works with the supplier – well in advance of providing the handsets to retailers or consumers – to develop, among other things, marketing plans and quality control plans.  T-Mobile requires and oversees supplemental quality control and testing of handsets to ensure that they function as intended and do not fail in the hands of customers.  Handsets with unacceptably high failure rates lead to increased handset returns at significant cost to T-Mobile.  And unreliable handsets cause customer dissatisfaction with T-Mobile, increasing customer churn and decreasing revenue and profitability.  Handset reliability is a significant competitive factor.

8.      The testing process is important for improving handset quality, but it is costly and time-consuming.  Faced with these issues, T-Mobile in 2006 began development of a unique and innovative solution:  a proprietary testing robot that would be easily adaptable to test any handset at minimal cost and with little training or labor needed.

9.      Approximately a year and a half after beginning this project in 2006, T-Mobile finished with a fully functional testing robot.  The robot, nicknamed "Tappy," operates by performing touches on the phone the same way a human being would – only much more frequently in a shorter period of time – and recording the results.  Simple in concept, but difficult in execution, the robot has reduced the costs of testing and increased the quality of the diagnostic results.  Since implementing testing using the robot, phone returns for T-Mobile have declined significantly and testing time has decreased dramatically.

10.     T-Mobile is the first developer of a testing robot of this nature, and the robot provides T-Mobile with a competitive advantage.  No other company had developed a similar touch robot when it debuted in 2007.  Several aspects of the robot are patented or patent-pending,

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS ACT, BREACH OF CONTRACT, INTERFERENCE WITH BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT - 3

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

and the remaining innovative aspects consist of closely-guarded trade secrets. Since then, numerous companies have asked T-Mobile whether it would license the technology to them. T-Mobile has not licensed to others the right to make and use their own robot based on T-Mobile's technology.

11.     T-Mobile now uses the robot when working with handset suppliers such as Huawei to perform quality control and testing. This testing occurs in T-Mobile's own labs in Bellevue, Washington. Because suppliers are the most familiar with their own products, T-Mobile allows suppliers into its labs under strict conditions to use T-Mobile's robot to perform diagnostic tests on the phones that will be provided by T-Mobile to customers.

12.     To protect the trade secrets involved in the function and design of the robot, T-Mobile requires that suppliers, including Huawei, enter into contracts that prohibit them from misappropriating information they learn about the robot during the testing process. Those suppliers, including Huawei, must agree to nondisclosure and confidentiality before they may test their products at T-Mobile's labs.

13.     With Huawei in particular, T-Mobile entered into at least three separate contracts that barred Huawei from misappropriating trade secrets and that otherwise required Huawei to keep T-Mobile's information confidential. T-Mobile's robot, its component parts, its functionality, and its software were protected by these nondisclosure and confidentiality contracts. Huawei employees were only authorized to use the robot to test their T-Mobile handsets in T-Mobile's labs, and were prohibited from disclosing or using information regarding the robot for any other purpose.

14.     Beyond requiring Huawei to enter into at least three separate confidentiality and trade secret protection agreements, T-Mobile took further steps to protect the robot. For example, T-Mobile required Huawei employees entering the lab to first go through security clearance. T-Mobile only allowed a limited number of Huawei employees into the lab, and those individuals had to be explicitly authorized to do so by name.

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS ACT, BREACH OF CONTRACT, INTERFERENCE WITH BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT - 4

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

15.     Beginning in 2012, when Huawei was first given access to T-Mobile's robot, Huawei's R&D department and other Huawei officials and employees conspired to steal T-Mobile's trade secrets so that Huawei could copy T-Mobile's robot.  Huawei accomplished this by obtaining access to T-Mobile's labs without permission, by stealing parts of the robot, by recording and copying confidential specifications, by copying operating software, and by violating its confidentiality and trade secret agreements with T-Mobile.  These particular acts are described in more detail below.  Huawei employees were caught on camera during many of these acts.  Huawei has since admitted to several of these violations.

16.     Huawei now has its own testing robot that performs the same functions as T-Mobile's robot.  Huawei continually stole information from T-Mobile to develop, improve, and troubleshoot its own robot.  Huawei admitted that it used stolen parts from T-Mobile's robot to diagnose and address the problems it was having with its own version.

17.     Huawei China R&D directed both its own employees and Huawei USA employees to steal this information from T-Mobile.  Huawei knew that it was violating its confidentiality and nondisclosure agreements.

18.     Huawei stole these trade secrets solely for its own benefit.  Its employees attempted to conceal their thefts from T-Mobile by lying and other subterfuge.  For instance, one Huawei employee who was continually peering into a security camera attempted to hide a stolen part from the robot behind a monitor in the T-Mobile lab.  He then slipped the hidden part into his laptop bag when leaving.  When confronted with this theft, the Huawei employee initially denied taking anything and claimed not to know that anything was missing.

19.     Furthermore, T-Mobile's robot is easily adaptable by design to test any handset.  Indeed, the robot was specifically designed to be able to test devices from any supplier.  Using T-Mobile's stolen technology, Huawei can therefore easily test and improve the other handsets it does not produce for T-Mobile.  On information and belief, Huawei is already using T-Mobile's stolen robot technology to test non-T-Mobile handsets and improve return rates for handsets developed and sold to other carriers.  On information and belief, Huawei has been unjustly

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS
ACT, BREACH OF CONTRACT, INTERFERENCE WITH
BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON
CONSUMER PROTECTION ACT - 5

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

1   enriched and will continue to be unjustly enriched by hundreds of millions of dollars from this

2   theft.  Huawei's acts were intentional and directed to give Huawei a competitive advantage in the

3   handset sales market worldwide.

4        20.    Due to Huawei's material breaches of its contracts with T-Mobile, and its

5   unlawful theft of trade secrets, T-Mobile was forced to stop its ongoing handset supply

6   relationship with Huawei at substantial cost.  That cost will likely reach at least tens of millions

7   of dollars.  T-Mobile has also incurred substantial costs in investigating these violations.

8        21.    T-Mobile is not Huawei's first victim of intellectual property theft.  Huawei has

9   stolen source code and trade secrets from other companies.  It has been condemned by

10  Congressional committees and other U.S. government entities for, among other things, its

11  "pattern of disregard for the intellectual property rights of other entities and companies in the

12  United States."

13       22.    This is an action that affects the public interest due to Huawei's continuing

14  pattern and practice of unlawful, unfair, and deceptive acts.  T-Mobile has suffered injury from

15  Huawei's theft of its unique and cutting-edge technology.  T-Mobile seeks damages for the

16  injury it has suffered and for Huawei's unlawful and unjust gain from the theft.  Huawei should

17  also be enjoined from further use of T-Mobile's stolen technology and from the sale and use of

18  products that have benefitted from that stolen technology.

19                                  **III.    PARTIES**

20       23.    Plaintiff T-Mobile USA, Inc. ("T-Mobile") is a Delaware corporation with its

21  principal place of business in Bellevue, Washington.

22       24.    Huawei Device USA, Inc. ("Huawei USA") is incorporated under the laws of

23  Texas with its principal place of business in Plano, Texas.  It is a successor to Futurewei

24  Technologies, Inc., and a wholly-owned subsidiary of Huawei Technologies Co. Ltd.

25       25.    Huawei Technologies Co. Ltd. ("Huawei China") is a Chinese company with its

26  principal place of business at Bantian, Longgang District, Shenzhen, People's Republic of China.

27

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS
ACT, BREACH OF CONTRACT, INTERFERENCE WITH
BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON
CONSUMER PROTECTION ACT - 6

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

26.     T-Mobile is informed and believes, and based thereon alleges, that at all times mentioned herein, each of the Defendants was the agent, servant and employee, co-venturer, alter ego, and co-conspirator of the other, and was at all times herein mentioned, acting within the course, scope, and purpose of such agency, employment, joint venture, and conspiracy, and with the consent, knowledge, ratification, and authorization of such agency, employment, joint venture, and conspiracy.

## IV.     JURISDICTION AND VENUE

27.     This Court has jurisdiction over this action under 28 U.S.C. § 1332(a)(2) because Huawei USA is a citizen of Texas, and Huawei China is a citizen or subject of a foreign state.  T-Mobile is a Delaware corporation with its principal place of business in Bellevue, Washington. The amount in controversy exceeds $75,000, exclusive of interest and costs.

28.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred, and a substantial part of the property that is the subject of this action is situated, in King County, Washington.  Additionally, venue is proper under the parties' Handset and Accessory Supply Agreement, which requires the matter be filed in King County, Washington.

## V.     GENERAL ALLEGATIONS

### T-Mobile's Proprietary Testing Robot

29.     In February 2006, T-Mobile began development of its solution for automated phone testing that would improve diagnostic ability, reduce testing time, improve reliability, limit handset returns, and reduce churn caused by handset reliability issues.  After roughly one and a half years and significant investment, T-Mobile introduced the first generation of its proprietary testing robot.

30.     The testing robot is designed to press buttons, push rollerballs, and navigate touchscreens in imitation of a human phone user.  The robot can execute usage scenarios such as typing, playing music, making calls, gaming, web browsing, and downloading applications. After each test, it provides detailed data, including video footage, on how the tested device

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS ACT, BREACH OF CONTRACT, INTERFERENCE WITH BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT - 7

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON  98103
telephone (206) 545-0345
fax (206) 545-0350

performed and where it failed.  The robot has been improved and refined over the last several years.  For instance, the first generation of the robot tested traditional button handsets rather than touchscreen handsets.  T-Mobile then developed improvements to the robot that allowed it to test touchscreen phones.

31.     Software problems with handsets have become a frequent reason for device returns in recent years.  Appropriate testing and quality assurance allows T-Mobile devices to execute hundreds of tasks over an extended period of time without stalls, freezes, or glitches.

32.     The robot can perform tests in a day that emulate handset usage for several weeks.  Since T-Mobile began using the robot, device return costs have been significantly reduced.  T-Mobile has received numerous inquiries from original equipment manufacturers and other companies about buying the robot or licensing its technology.  T-Mobile has not sold or licensed the technology.

33.     The robot is hooked up to a computer, which allows the user to change the operation of the robot and record testing results.  The robot's operating software is confidential and proprietary and was also developed by T-Mobile.  The current version of the robot embodies closely guarded trade secrets as well as patented and patent-pending technology.

34.     T-Mobile has testing facilities at its Bellevue, Washington campus.  T-Mobile permits its phone suppliers to access these facilities and use the robot to test the devices that they supply to T-Mobile.  As a matter of policy, T-Mobile requires suppliers to sign nondisclosure agreements to protect T-Mobile's proprietary technology, and the robot in particular.

<u>T-Mobile's Contracts with Huawei</u>

35.     T-Mobile and Futurewei Technologies, Inc. d/b/a Huawei Technologies (USA) ("Futurewei") entered into a Handset and Accessory Supply Agreement on June 2, 2010 (the "Supply Agreement").  This agreement sets forth the terms under which T-Mobile would order, and Huawei would supply, handsets and accessories over a term of several years.  Both parties committed to various measures as part of the supplier relationship, and agreed to protect and not share confidential trade secrets necessarily disclosed in the performance of the parties' duties.

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS ACT, BREACH OF CONTRACT, INTERFERENCE WITH BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT - 8

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

36.     Futurewei thereafter splintered into three entities and assigned the Supply Agreement to Huawei USA.

37.     T-Mobile and Huawei additionally entered into a Mutual Nondisclosure Agreement ("the NDA") relating to the "testing of [Huawei's] handset and accessories on T-Mobile's premises utilizing automated robotic testers" on July 31, 2012.  Each party promised to use confidential information received from the other only for the express purpose stated in the NDA – handset testing on T-Mobile's premises using automated robotic testers.  Attempts to copy confidential and trade secret information via reverse engineering, photography, attempting to discover source code, and other means are expressly prohibited by the NDA.

38.     The NDA is signed by Huawei USA.  The NDA provides that Huawei USA also signs on behalf of its parent, Huawei China.  Thus, the contract is binding on both Huawei USA and Huawei China.

39.     Shortly thereafter, T-Mobile and Huawei USA entered into a Letter Agreement ("The Clean Room Letter") elaborating on the "general understanding and agreement between the parties relating to the contemplated robot testing protocol."  The Clean Room Letter, which is supplemental to the Supply Agreement, specifically identifies the testing robot as protected, trade secret technology.  It explicitly prohibits Huawei from photographing or otherwise trying to capture the likeness or design of the robot or test facilities, and from copying computer programs or source code.  In exchange for signing this document, T-Mobile allowed Huawei employees access to the robot testing facilities.

40.     In 2013, T-Mobile assumed MetroPCS Wireless, Inc.'s rights and obligations under a Supply Agreement with Huawei (the "MetroPCS Agreement").  This contract also contains provisions restricting the use and disclosure of the parties' confidential trade secrets.

<u>Huawei's Theft of Trade Secrets</u>

41.     In late 2012, T-Mobile set up a testing laboratory for the purpose of testing handsets, including those manufactured by Huawei.  Huawei employees were given limited access to this lab after Huawei signed each of the confidentiality contracts described above.

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS ACT, BREACH OF CONTRACT, INTERFERENCE WITH BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT - 9

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

42.     In the testing laboratory, Huawei employees were allowed to perform and monitor diagnostic tests for Huawei T-Mobile handsets using T-Mobile's proprietary testing robot. Huawei employees were also given access to the test results for Huawei devices.

### Huawei's Inquiry Into Non-Public Aspects of the Robot's Specifications

43.     On several occasions in 2012 and continuing to 2013, Huawei employees asked T-Mobile personnel detailed questions about the testing robot.  These questions frequently concerned the conductive tip on the end of the "end effector" – a metal plate that affixes to the bottom of the robot arm.  Indeed, as time went on Huawei's questions became more pointed and intrusive about the exact operational details of the robot.  T-Mobile personnel did not provide answers to these questions about T-Mobile's proprietary technology.

44.     Huawei eventually acknowledged that T-Mobile was unwilling to respond to Huawei's sensitive questions about the operation and specifications of the robot and related technology.  Undeterred, Huawei continued to seek this information even though it was clear T-Mobile was unwilling to share it.

### Prohibited Photographing of the Robot

45.     In early May of 2013, Huawei employee Yu (Frank) Wang arrived in Bellevue. Mr. Wang was a member of Huawei's Test Systems Research and Development Team in China and had never before been to T-Mobile's facilities.  The true purpose of his trip – which was not disclosed to T-Mobile – was to learn more about T-Mobile's robot so that Huawei could make improvements to and develop its own robot.

46.     On May 13, 2013, two Huawei employees – Huawei lead engineer Xinfu (Adam) Xiong and Helen Lijingru – brought Mr. Wang into the T-Mobile testing lab with them without T-Mobile's consent.  The Huawei employees were told that Mr. Wang was not allowed to be in the lab because he did not have authorization.  Mr. Wang left the lab at T-Mobile's repeated insistence.

47.     Neither Mr. Xiong nor Ms. Lijingru was allowed to give other Huawei employees (or anyone else) access to the lab.  Only authorized T-Mobile personnel are allowed to do so.

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS ACT, BREACH OF CONTRACT, INTERFERENCE WITH BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT - 10

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

48.     Nonetheless, on May 14, 2013, one day after Mr. Wang had just been told he could not enter the lab, Mr. Xiong and Ms. Lijingru secretly escorted Mr. Wang into the T-Mobile testing lab to photograph the testing robot.  Using a smartphone, Mr. Wang took at least seven photographs of the testing robot, in violation of the Clean Room Letter's explicit prohibition on photography in the lab.

49.     When Mr. Wang's unauthorized presence in the lab was discovered by T-Mobile, Mr. Wang was immediately asked to leave.  Ms. Lijingru claimed that Mr. Wang had been authorized by T-Mobile to enter the lab that day.  In fact, he had never received authorization.

50.     That night, Mr. Wang forwarded the photographs he had taken of the robot to Huawei's R&D team in China.

51.     As a result of this incident, further restrictions were placed on Huawei's access to T-Mobile facilities.  As of May 15, 2013, T-Mobile allowed only one Huawei employee access to the lab.  Huawei selected its lead engineer, Mr. Xiong, to be the one employee who had access to the testing chamber.  Mr. Xiong was required to sign in at the security desk and be escorted to the testing chamber by a T-Mobile employee.  His activities were recorded by a camera in the lab.

52.     Huawei Human Resources Director Jennifer Ponder provided T-Mobile with only four of the seven photographs taken by Mr. Wang.  Ms. Ponder claimed the other three were blurry and that Mr. Wang deleted them.

53.     Barred from T-Mobile's lab, Mr. Wang then returned to China earlier than scheduled.

### Theft and Measurement of the "End Effector" Robot Part

54.     On May 29, 2013, Mr. Xiong was provided four end effectors for testing purposes in T-Mobile's testing lab.

55.     While alone in the lab, Mr. Xiong attempted to hide one of these end effectors out of the view of the security camera behind a computer monitor.  Three hours later, while glancing repeatedly at the security camera, Mr. Xiong moved the end effector from behind the monitor

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS ACT, BREACH OF CONTRACT, INTERFERENCE WITH BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT - 11

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

and slipped it into his laptop bag.  Mr. Xiong then carried the laptop bag out of the testing chamber.

56.     Shortly after Mr. Xiong departed, the missing end effector was immediately noticed by T-Mobile and Mr. Xiong was called.  Despite having just taken the end effector from the lab only nine minutes earlier, Mr. Xiong denied knowing where it was.  Roughly an hour later, Mr. Xiong sent a text message claiming to have "found" the end effector in his laptop bag.  Mr. Xiong eventually admitted that he lied when he said he did not know where the end effector was.

57.     Mr. Xiong took the end effector to Huawei Device USA's offices and used it to provide measurements to Huawei China's R&D division during a conference call.  Mr. Xiong later admitted he took the end effector because Huawei China wanted to know the size of the finger and the tip and the material out of which the tip is made and that Huawei R&D believed this information would allow its own robot to perform as well as T-Mobile's robot.

58.     Huawei R&D instructed Mr. Xiong to retrieve this information about T-Mobile's robot finger and tip.  Mr. Xiong admitted that this was a matter of great urgency for Huawei.  Mr. Xiong admitted that he needed to have the end effector with him for the conference call because he anticipated Huawei R&D would have many questions about it.

59.     Mr. Xiong, in fact, disclosed information regarding the stolen end effector to Huawei R&D.

60.     Mr. Xiong was not authorized to take or measure the end effector by anyone at T-Mobile.  His theft and measurement of the part were prohibited by the parties' contracts.  Huawei nonetheless instructed him to steal the part so that it could benefit by further refining and developing its robot using stolen T-Mobile technology.

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS
ACT, BREACH OF CONTRACT, INTERFERENCE WITH
BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON
CONSUMER PROTECTION ACT - 12

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

*Theft of Sequence Files Operating Software*

61.     Sequence files control the movements of the proprietary testing robot.  These files, which are themselves proprietary trade secrets, are present on the computers in the testing lab.

62.     On information and belief, Huawei employees accessed and sent proprietary sequencing files via email to others at Huawei.  They were explicitly forbidden from doing so by T-Mobile.

*Attempt to Re-Activate Security Badge*

63.     In response to the incidents of theft described above, T-Mobile took away Huawei's security access to the lab and recalled Huawei's security badges.  T-Mobile informed Huawei that its employees were only allowed on T-Mobile's campus as visitors and had to be escorted to the testing facility by someone with security clearance.

64.     Despite these sanctions from T-Mobile, and Huawei's repeated claims that it would train its employees to respect security and confidentiality protocols, a Huawei vendor attempted to re-activate a security badge (which should have been returned or destroyed) at T-Mobile's badge station on October 23, 2013.  The vendor attempted to use this badge to access restricted areas of T-Mobile's facility.

*Huawei's Attempts to Copy T-Mobile's Robot*

65.     Huawei's efforts to steal T-Mobile's robot technology were motivated by Huawei's desire to develop and improve its own testing robot.

66.     In early 2013, Mr. Xiong contacted a dealer of robot parts that was a T-Mobile supplier.  Mr. Xiong asked the dealer if it could build Huawei a testing robot platform in the T-Mobile configuration.

67.     In a May 30, 2013 phone call with a T-Mobile employee, Huawei representative Sacha Wu admitted that the reason Huawei personnel asked questions about the robot and took pictures of it was so that Huawei could build its own robot.

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS
ACT, BREACH OF CONTRACT, INTERFERENCE WITH
BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON
CONSUMER PROTECTION ACT - 13

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

68.     In a June 3, 2013 meeting with T-Mobile employees, Huawei Device USA Executive Vice President Michael Chang stated that Mr. Wang took the photographs and Mr. Xiong removed the end effector so that Huawei could build its own robot.

69.     In a June 12, 2013 interview, Mr. Xiong stated that Mr. Wang took photographs of the robot because Huawei headquarters in China could not reproduce results from the T-Mobile robot in its own lab.  Mr. Xiong stated that Huawei needed information regarding the correct times, force, and duration for T-Mobile's robot – the number of times the "finger" touches the device, the force of the pressure applied, and the duration of that pressure.

70.     In that same interview, Mr. Xiong stated that he took the end effector from T-Mobile's testing chamber because Huawei headquarters needed to know the size of the conductive tip and the material out of which it is made, along with the size of the "finger" – the post on which the tip resides.  Mr. Xiong stated that he provided seven measurements of the finger and the tip to Huawei headquarters.

71.     In a June 17, 2013 interview, Mr. Wang stated that he took photographs of the T-Mobile robot and sent them to the Huawei "X-Device Robot Team" in China because Huawei tests could not reproduce T-Mobile tests.  Mr. Wang further stated that the X-Device Robot Team wanted to understand more about the size of the robot hand and its material.

72.     Huawei R&D knew T-Mobile was closely guarding the information about the robot, but it encouraged Huawei employees to steal the information anyway.

### Huawei's Pattern of Misconduct in the United States

73.     As described below, Huawei's pattern of misconduct with T-Mobile and others demonstrates a substantial likelihood that this behavior will continue to pose substantial risks to T-Mobile and other companies in the future.  This is to the detriment of consumers, and thus implicates the public interest under the Washington Consumer Protection Act.  Huawei's past, present, and expected future pattern of unfair, unlawful, and deceptive conduct is therefore relevant in this action.

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS ACT, BREACH OF CONTRACT, INTERFERENCE WITH BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT - 14

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

74.     Huawei has a documented history of violating security and confidentiality protocols in order to steal technology or obtain other competitive advantages.  Huawei has consistently demonstrated a disregard for the intellectual property rights of others, which is followed by denial and uncooperativeness in the face of obvious violations.

75.     This history creates a substantial risk that Huawei's misconduct against T-Mobile will be repeated against other entities.

### Congressional Investigation

76.     In November 2011, the U.S. House of Representatives Permanent Select Committee on Intelligence initiated an investigation into the security threat and intellectual property risks posed by Huawei, concluding that Huawei "exhibits a pattern of disregard for the intellectual property rights of other entities and companies in the United States."

### Misappropriation of Cisco Source Code

77.     After Cisco sued Huawei in 2003 for misappropriating its source code, Huawei eventually admitted that some of its code came from an unauthorized source and pulled certain products off the market.

78.     In 2012, Huawei denied any wrongdoing, which in turn prompted Cisco to release sections of the "Neutral Expert's Final Source Code Report."  Among the Neutral Expert's findings:  "It must be concluded that Huawei misappropriated this code."

## VI.     FIRST CAUSE OF ACTION

### (Violation of Washington Uniform Trade Secrets Act Against Huawei China and Huawei USA)

79.     T-Mobile re-alleges each and every allegation in paragraphs 1 through 72 as though fully set forth herein.

80.     The trade secrets owned by T-Mobile and improperly acquired by Huawei include information and know-how relating to the design, assembly, and operating methods of the T-Mobile testing robot – including specifications, source code, component selection, and operating instructions – as well as other non-public elements of the robot technology, and proprietary

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS
ACT, BREACH OF CONTRACT, INTERFERENCE WITH
BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON
CONSUMER PROTECTION ACT - 15

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

combinations and implementations of the robot. These trade secrets derive independent value from their secrecy and T-Mobile has taken reasonable efforts to maintain their secrecy.

81.    Huawei improperly acquired T-Mobile's trade secrets through, among other things, providing unauthorized access to the T-Mobile testing lab, stealing an end effector, copying and recording non-public parts and materials specifications, taking prohibited photographs of the robot, and stealing source code. These actions violate several explicit provisions of the Supply Agreement, the NDA, and the Clean Room Letter, and other applicable agreements meant to protect T-Mobile's confidential information.

82.    The Huawei employees who improperly acquired T-Mobile's trade secrets disclosed these trade secrets to other employees at Huawei, including the development team involved in Huawei's efforts to build its own testing robot. At all times, those employees were acting within the scope of their employment for Huawei. Huawei used T-Mobile's confidential information to build and improve its own robot based on T-Mobile's technology.

83.    Huawei has used the robot technology it misappropriated from T-Mobile to unjustly gain a commercial advantage worth hundreds of millions of dollars through, among other things, superior device performance and reliability, reduced return costs, faster testing times, and saved development costs. On information and belief, Huawei bears the costs of device returns in its agreements with carriers. On information and belief, Huawei has used T-Mobile's technology to test devices supplied to carriers other than T-Mobile. T-Mobile is entitled to damages for Huawei's unjust enrichment.

84.    T-Mobile has vigilantly guarded its trade secrets related to the testing robot through procedures such as nondisclosure agreements and security controls for suppliers given access to the robot. With respect to Huawei, specifically, T-Mobile denied access to its testing chamber to all but one Huawei employee after Mr. Wang was caught on camera taking photographs of the robot. T-Mobile has declined to license or sell the robot.

85.    T-Mobile's robot technology is of substantial economic value that would be lost if T-Mobile's trade secrets were disclosed to the public. The testing robot has given T-Mobile a

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS
ACT, BREACH OF CONTRACT, INTERFERENCE WITH
BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON
CONSUMER PROTECTION ACT - 16

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

competitive advantage by improving the performance and reliability of its devices and lowering return-related costs, leading to increased profitability.  This advantage would be lost if the technology were available to T-Mobile's competitors or to handset suppliers who work with T-Mobile's competitors.  Huawei's own efforts to misappropriate the robot technology are evidence of its economic value, as are the repeated inquiries by third parties to license the technology and the widespread industry interest the robot has generated.

86.     T-Mobile has incurred substantial costs as a proximate result of Huawei's misappropriation of its trade secrets and is entitled to damages, including but not limited to those relating to security costs, investigation costs, investment in testing and marketing Huawei devices, costs of replacing Huawei as a supplier, increased costs for replacement supplies, and loss of the economic value T-Mobile derives from exclusive use of its proprietary technology.

87.     In addition to damages, T-Mobile is entitled to injunctive relief enjoining Huawei's continued misappropriation of T-Mobile's robot technology.  If the Court determines that it would be unreasonable to prohibit Huawei's future use of the technology, such future use should be conditioned upon payment of a reasonable royalty to T-Mobile.

88.     Huawei's misappropriation of T-Mobile's trade secrets is willful and malicious, and continued even after T-Mobile discovered Huawei's misconduct and imposed additional security measures.

## VII.     SECOND CAUSE OF ACTION

### (Breach of Contract against Huawei China and Huawei USA)

89.     T-Mobile re-alleges each and every allegation in paragraphs 1 through 72 as though fully set forth herein.

90.     The Supply Agreement, NDA, Clean Room Letter, and other applicable agreements (such as the MetroPCS Agreement) between the parties are valid and enforceable contracts, according to which T-Mobile has performed all conditions, covenants, and promises.

91.     Huawei Device USA is a signatory to the Supply Agreement, NDA, Clean Room Letter, and other applicable agreements between the parties and subject to their terms.

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS
ACT, BREACH OF CONTRACT, INTERFERENCE WITH
BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON
CONSUMER PROTECTION ACT - 17

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

92.     Huawei China is subject to the terms of the NDA.

93.     Huawei is liable under the terms of the contracts for breaches committed by its employees.

94.     Through the acts described above, Huawei USA has materially breached the Supply Agreement and other applicable agreements between the parties, including confidentiality provisions, which protect, among other things, T-Mobile's proprietary information, intellectual property, and trade secrets.

95.     Through the acts described above, Huawei has materially breached the NDA, including section 3 and section 5, which protects from disclosure, and limits the use of, T-Mobile's confidential information.  The NDA authorizes the use of T-Mobile's Confidential Information "only for the purpose of accomplishing the handset testing protocol" and states that Huawei "shall not use or exploit such Confidential Information for any other purpose without the prior written consent" of T-Mobile.  The NDA specifically prohibits Huawei from attempting to "capture photographs" or "reverse engineer, decompile, dissemble or reverse translate" the robot, and from "attempt[ing] to discover the source code or trade secrets in any such Confidential Information . . . ."

96.     T-Mobile is entitled to consequential damages for Huawei's willful misconduct and breach of confidentiality.

97.     T-Mobile has incurred substantial costs as a proximate result of Huawei's breach of its material obligations under such contracts and is entitled to damages, including but not limited to those relating to security costs, investigation costs, investment in testing and marketing Huawei devices, costs of finding a replacement supplier, increased costs for replacement supplies, and loss of the economic value T-Mobile derives from exclusive use of its proprietary technology.

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS ACT, BREACH OF CONTRACT, INTERFERENCE WITH BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT - 18

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

# VIII.     THIRD CAUSE OF ACTION

## (Interference with Business Expectancy and Contractual Relationship against Huawei China)

98.     T-Mobile re-alleges each and every allegation in paragraphs 1 through 72 as though fully set forth herein.

99.     Huawei China knew about the handset supply relationship between Huawei USA and T-Mobile, as well as the terms of the Supply Agreement, the Clean Room Letter, and other applicable agreements.

100.     Huawei China induced and purposely caused Huawei USA to breach its material obligations related to T-Mobile's confidential information under the applicable agreements. Huawei China took advantage of Huawei USA's access to T-Mobile's trade secrets to build its own testing robot based on those trade secrets; on information and belief, it has used the testing robot on devices sold to other carriers by Huawei China and other Huawei entities.

101.     Huawei China sent its employee, Mr. Wang, to the United States to steal trade secrets from T-Mobile.  Huawei China instructed Huawei USA to assist Mr. Wang in his attempt to steal trade secrets from T-Mobile, in violation of Huawei USA's confidentiality and nondisclosure obligations.

102.     Mr. Wang disclosed the confidential information he wrongfully acquired from the T-Mobile testing chamber to a Huawei China R&D team.

103.     Huawei China instructed Mr. Xiong to misappropriate T-Mobile's confidential information.  Specifically, it asked Mr. Xiong to steal an end effector and report measurements to Huawei China's R&D team.  As instructed, Mr. Xiong provided the information he misappropriated to employees of Huawei China.

104.     Employees of both Huawei China and Huawei USA have repeatedly explained that the purpose of these acts of misappropriation was to facilitate Huawei China's efforts to build its own testing robot.

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS ACT, BREACH OF CONTRACT, INTERFERENCE WITH BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT - 19

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

105.     Huawei China induced Huawei USA's breach of its material obligations under the applicable agreements through improper means, including various illegal acts.

106.     As a proximate consequence of the Huawei USA breaches induced by Huawei China, T-Mobile has incurred substantial costs and is entitled to damages, including but not limited to those relating to security costs, investigation costs, investment in testing and marketing Huawei devices, costs of finding a replacement supplier, increased costs for replacement supplies, and loss of the economic value T-Mobile derives from exclusive use of its proprietary technology.

## IX.      FOURTH CAUSE OF ACTION

### (Violation of Washington Consumer Protection Act against Huawei China and Huawei USA)

107.     T-Mobile re-alleges each and every allegation in paragraphs 1 through 78 as though fully set forth herein.

108.     Through the acts described above, Huawei has engaged in unfair practices in violation of the public interest by stealing the technology of its business partner T-Mobile in violation of a nondisclosure agreement.  Separately, Huawei's conduct has the capacity to deceive a substantial portion of the public by passing off T-Mobile's testing technology as its own and attributing improvements to its devices to its own efforts rather than T-Mobile's R&D.

109.     Huawei's misconduct, as described above, affects the public interest by virtue of a real and substantial potential for repetition of the unfair and deceptive acts it has committed against T-Mobile.  The likelihood that additional plaintiffs have been or will be injured in the same fashion T-Mobile has been injured is exceptionally high given Huawei's documented history of violating the intellectual property rights of U.S. companies.  The public's interest in preventing Huawei's misconduct is also evidenced by the fact that Huawei actively solicited T-Mobile's business through participation in T-Mobile's Request for Proposal process in which numerous domestic and international companies competed with Huawei to supply handsets through T-Mobile to the public at large.  Moreover, Huawei advertises to the general public.

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS ACT, BREACH OF CONTRACT, INTERFERENCE WITH BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT - 20

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

110.    T-Mobile's property interests have been injured in numerous ways as a result of Huawei's unfair and deceptive acts.  These injuries include, for instance, added security costs, investigation costs, investment in testing and marketing Huawei devices, costs of replacing Huawei as a supplier, increased costs for replacement supplies, and loss of the economic value T-Mobile derives from exclusive use of its proprietary technology.

111.    But for Huawei's unfair and deceptive practices, T-Mobile would not have suffered these injuries.

## X.    PRAYER FOR RELIEF

WHEREFORE, T-Mobile prays for judgment as follows:

A.      On the First Cause of Action, damages in the amount of T-Mobile's actual losses and Huawei's unjust enrichment; exemplary damages amounting to twice the sum of actual losses and unjust enrichment for willful and malicious misappropriation; and injunctive relief or a reasonable royalty;

B.      On the Second Cause of Action, for damages in an amount to be proven at trial, including expectation damages, consequential damages, and incidental damages;

C.      On the Third Cause of Action, for damages in an amount to be proven at trial;

D.      On the Fourth Cause of Action, for actual damages and treble damages in an amount up to the statutory maximum in addition to actual damages;

E.      For injunctive relief enjoining Huawei's continued misappropriation and exploitation of T-Mobile's confidential information, trade secrets, and otherwise protected technology;

F.      For reasonable attorney fees and costs;

G.      For pre-judgment interest on all damages; and

H.      For such other relief as the Court deems just and proper.

///

///

///

KIPLING LAW GROUP PLLC
3601 FREMONT AVE N, SUITE 414
SEATTLE, WASHINGTON 98103
telephone (206) 545-0345
fax (206) 545-0350

1    DATED this 2nd day of September, 2014.

2

3                                    s/ Michael E. Kipling
                                     Michael E. Kipling, WSBA #7677
4                                    kipling@kiplinglawgroup.com

5                                    s/ Marjorie A. Walter
                                     Marjorie A. Walter, WSBA #40078
6                                    walter@kiplinglawgroup.com

7                                    KIPLING LAW GROUP PLLC
                                     3601 Fremont Avenue N., Suite 414
8                                    Seattle, WA 98103
                                     (206) 545-0345
9                                    (206) 545-0350 (fax)

10

11                                   John Hueston (*Pro Hac Vice* pending)
                                     jhueston@irell.com
12                                   Alison Plessman (*Pro Hac Vice* pending)
                                     aplessman@irell.com
13                                   Eric Hayden (*Pro Hac Vice* pending)
                                     ehayden@irell.com
14                                   IRELL & MANELLA LLP
                                     1800 Avenue of the Stars, Suite 900
15                                   Los Angeles, CA 90067-4276
                                     (310) 277-1010
16                                   (310) 203-7199 (fax)

17                                   *Counsel for Plaintiff T-Mobile USA, Inc.*

18

19

20

21

22

23

24

25

26

27

COMPLAINT FOR VIOLATION OF UNIFORM TRADE SECRETS
ACT, BREACH OF CONTRACT, INTERFERENCE WITH
BUSINESS EXPECTANCY, AND VIOLATION OF WASHINGTON
CONSUMER PROTECTION ACT - 22