HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

T-MOBILE USA, INC.,

        Plaintiff,

    v.

HUAWEI DEVICE USA, INC., et al.,

        Defendants.

CASE NO. C14-1351RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on a motion to dismiss from Defendant Huawei Device USA, Inc. ("Huawei USA") and a motion to dismiss from its Chinese parent company, Defendant Huawei Technologies Co., Ltd. ("Huawei China").  Although the parties have requested oral argument, the court finds oral argument unnecessary in light of the six extensive briefs before it.  For the reasons stated herein, the court GRANTS both motions to dismiss in part and DENIES them in part.  Dkt. ## 32, 54.

## II.  BACKGROUND

The court describes the facts as Plaintiff T-Mobile USA, Inc. ("T-Mobile") alleges them in its complaint, suggesting no opinion on whether its allegations will prove true.  The court cites the numbered paragraphs of the complaint using bare "¶" symbols

ORDER – 1

1    T-Mobile, a national mobile phone network provider, contends that Huawei,[1] one

2    of many entities that supplies it with mobile phone handsets, has stolen robot technology

3    that T-Mobile uses to test handsets.

4        T-Mobile maintains a handset testing facility at its offices in Bellevue,

5    Washington offices.  ¶ 34.  That facility houses "Tappy," a robot that T-Mobile designed

6    to test mobile phone handsets.  According to T-Mobile, it begin developing Tappy in

7    2006 and placed Tappy in service in 2007.  ¶¶ 8-10.  Patents protect some aspects of

8    Tappy's technology; other aspects are T-Mobile's closely-guarded trade secrets.  ¶ 10.

9        T-Mobile first granted Huawei access to the "clean room" that contains Tappy in

10   2012, so that Huawei could assist with testing its own handsets.  ¶¶ 15, 42.  Huawei USA

11   (or its corporate predecessor) has been a T-Mobile handset supplier since it signed a

12   supplier agreement in June 2010.  ¶¶ 24, 35, 36.  Before granting Huawei USA access to

13   the clean room, T-Mobile required it to sign both a July 2012 testing non-disclosure

14   agreement and, shortly thereafter, a separate "Clean Room Letter" with additional

15   security provisions.  ¶¶ 37-39.  T-Mobile contends that the July 2012 non-disclosure

16   agreement binds Huawei China as well.  ¶ 38.  In addition to contractual confidentiality

17   provisions, T-Mobile limited Huawei's access to the clean room.  It limited the number of

18   Huawei employees who could enter the clean room and required all of those employees

19   to obtain security clearances.  ¶ 14.

20       Despite these confidentiality agreements and security measures, Huawei stole

21   confidential information about Tappy so that it could develop a competing testing robot.

22   It could not have doubted that T-Mobile considered that information confidential,

23   because T-Mobile frequently refused to answer Huawei's detailed questions about

24   Tappy's specifications.  ¶¶ 43-44.  Those questions often focused on a conductive tip at

25

26   _____

27   [1] The court uses the collective term "Huawei" either when referring to both Huawei China and
     Huawei USA, or when T-Mobile's complaint gives the court no basis to determine which
     Huawei entity is responsible for a particular act.

28   ORDER – 2

the end of Tappy's "end effector," which is a metal plate that attaches to the bottom of Tappy's arm.  ¶ 43.

In May 2013, Huawei China employee Yu Wang arrived in Bellevue from China on a mission to acquire confidential information about Tappy.  ¶¶ 45, 101.  He came to T-Mobile's testing facilities with two other Huawei employees, lead engineer Xinfu Xiong and Helen Lijingru.  ¶ 46.  Although Mr. Xiong and Ms. Lijingru had permission to be in the clean room, Mr. Wang did not.  T-Mobile told them to remove Mr. Wang from the clean room.  ¶ 46.  Mr. Xiong and Ms. Lijingru nonetheless brought him back the following day, and secretly escorted him into the clean room.  ¶ 48.  Mr. Wang used his own phone to take at least 7 photos of Tappy.  ¶ 48.  T-Mobile discovered Mr. Wang's presence and forced him to leave the facility.  ¶ 49.  Mr. Wang nonetheless forwarded the photographs to the Huawei China research and development team.  ¶ 50, *see also* ¶ 17 (alleging that Huawei's research and development team was part of Huawei China).  Huawei later surrendered 4 of the photos to T-Mobile, claiming that the remainder were too blurry to be of use.  ¶ 52.  Mr. Wang admitted in a June 2013 interview that he took the photos to assist Huawei's testing robot development team.  ¶ 71.

In the wake of Mr. Wang's unauthorized actions, T-Mobile racheted up security restrictions on Huawei.  It barred all Huawei personnel except Mr. Xiong from the clean room.  ¶ 51.  It required that he be escorted to the room, and that his activities in the room be recorded on video.  ¶ 51.

In late May 2013, T-Mobile gave Mr. Xiong four end effectors in the clean room for testing.  ¶ 54.  He hid one of them from the view of the security camera, then placed it in his laptop bag and took it out of the clean room.  ¶ 55.  T-Mobile quickly discovered that it was missing, then confronted Mr. Xiong, who denied intentionally taking it.  ¶ 56.  Mr. Xiong took the stolen end effector to Huawei USA's local offices, took measurements and conducted other analyses, and sent the results to Huawei's research and development team in China.  ¶¶ 57-59.  Mr. Xiong admitted in a June 2013 interview

ORDER – 3

that both Mr. Wang's photographs and his analyses of the end effector were appropriated to assist in Huawei's development of a testing robot.  ¶¶ 69-70. He admitted that he had been inquiring with third parties about developing a testing robot since early 2013.  ¶ 66. A Huawei USA executive vice president admitted that Mr. Wang and Mr. Xiong acted to assist Huawei with developing a testing robot.  ¶ 68.

In addition to Mr. Wang's photographs and Mr. Xiong's theft of the end effector, T-Mobile alleges that unnamed Huawei representatives stole "sequence files," software files used to guide Tappy's testing procedures.  ¶¶ 61-62.

Huawei used the fruits of its theft to build a testing robot.  ¶ 16.  It now uses that robot to test its own handsets.  ¶ 19.

Because of Huawei's conduct, T-Mobile terminated its supplier relationship.  The cost of that termination, along with the cost of investigating Huawei's theft, is millions of dollars.  ¶ 20.

From these allegations, T-Mobile attempts to state four causes of action.  It contends that both Huawei USA and Huawei China are liable for misappropriation of trade secrets in violation of Washington's version of the Uniform Trade Secrets Act ("UTSA," RCW Ch. 19.108), for breach of contracts protecting T-Mobile's confidential information (including the 2010 supply agreement, the 2012 non-disclosure agreement, and the Clean Room Letter), and for violation of the Washington Consumer Protection Act ("CPA," RCW Ch. 19.86).  T-Mobile contends that Huawei China alone is liable for interfering with T-Mobile's contractual relationships and business expectancies.

Huawei USA has invoked Federal Rule of Civil Procedure 12(b)(6), moving to dismiss the three causes of action against it for failure to state a claim.  Huawei China filed its own motion joining its subsidiary's motion, but also requesting that the court dismiss the tortious interference claim for failure to state a claim.  In addition, Huawei China invoked Federal Rule of Civil Procedure 12(b)(2), asking the court to dismiss all claims against it for lack of personal jurisdiction.

ORDER – 4

The court now considers both motions to dismiss.

### III.   ANALYSIS OF RULE 12(b)(6) MOTIONS

Both Huawei Defendants invoke Fed. R. Civ. P. 12(b)(6), which permits a court to dismiss a complaint for failure to state a claim.  The rule requires the court to assume the truth of the complaint's factual allegations and credit all reasonable inferences arising from those allegations.  *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007).  The plaintiff must point to factual allegations that "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 (2007).  If the plaintiff succeeds, the complaint avoids dismissal if there is "any set of facts consistent with the allegations in the complaint" that would entitle the plaintiff to relief.  *Id.* at 563; *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").  The court typically cannot consider evidence beyond the four corners of the complaint, although it may rely on a document to which the complaint refers if the document is central to the party's claims and its authenticity is not in question.  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).  The court may also consider evidence subject to judicial notice.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

A.      **T-Mobile Has Adequately Pleaded a Trade Secret Claim.**

A trade secret is "information, including a formula, pattern, compilation, program, device, method, technique, or process" that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  RCW 19.108.010.  Huawei contends that it has not misappropriated any T-Mobile trade secret because T-Mobile has not adequately pleaded that anything about Tappy is a trade secret.

ORDER – 5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.    T-Mobile Has Adequately Pleaded the Existence of Trade Secrets.

The standard that applies to a Rule 12(b)(6) motion is fatal to Defendants' attacks on T-Mobile's trade secret claim.  Huawei prefers that the court ignore portions of T-Mobile's complaint and rely instead on facts not mentioned in that complaint.  The centerpiece of their attack is a collection of United States and foreign patent applications in which T-Mobile allegedly publicly disclosed at least some of the technology incorporated in Tappy, along with a collection of disclosures in the media in which T-Mobile boasted of its testing lab and published (or allowed others to publish) video and photographs showing Tappy in action.  All of those disclosures preceded Huawei's wrongdoing.  There is no trade secret, Huawei contends, because T-Mobile had already publicly disclosed everything about Tappy before the acts of Mr. Wang and Mr. Xiong.

The court assumes, purely for purposes of this motion, that it could properly rely on this collection of public material in considering Huawei's motions to dismiss.  Even so, that material does not suffice on a motion to dismiss to defeat T-Mobile's assertion of a trade secret.  It is simple enough to conclude, based on this host of disclosures, that T-Mobile publicly disclosed much about Tappy.  It is another matter entirely to conclude, especially given the limitations of a motion to dismiss for failure to state a claim, that T-Mobile disclosed *everything* about Tappy, including trade secret information.  Huawei's arguments to the contrary are unconvincing.

The most obvious flaw in Huawei's arguments is that T-Mobile has alleged that its representatives stole information about Tappy.  The court must credit those allegations as true.  Absent from either of the motions to dismiss is an explanation of why Mr. Xiong, Mr. Wang, and other Huawei representatives would have taken those actions if everything they wanted to know about Tappy had already been publicly disclosed.  T-Mobile has alleged specific acts by which Huawei representatives attempted to furtively appropriate information about Tappy.  Because it is unusual to steal what one can freely obtain in the public domain, it is plausible to infer that Huawei was stealing trade secret

ORDER – 6

information.  There may be other plausible inferences, but that makes no difference on a motion to dismiss.

Take, for example, Huawei's assertion, based on the presence of an "Epson" logo on one of Tappy's components as demonstrated in one of the videos, that Epson, not T-Mobile, developed Tappy.  That assertion fails at the threshold, because the court must credit the plausible inference that Epson provided only a component of the robot, and that T-Mobile made modifications or additions of its own.  But even if that were not the case, if Epson built Tappy, why did Huawei not simply purchase its own Tappy from Epson, as opposed to having Mr. Wang and Mr. Xiong take surreptitious photographs and steal an end effector for analysis?  A plausible answer is that Epson could not give Huawei everything it needed to build a testing robot that suited Huawei's needs.

The same is true of the collection of patent applications to which Huawei points. At the threshold, the court is in no position on a motion to dismiss to sift through patent applications and discern whether they fully disclose everything about Tappy.  That is true for many reasons.  Patent applications disclose only implementations of an invention as of the date of the application, including the "best mode" of implementing the application known to the inventor at the time.  It is plausible, based on the allegations of T-Mobile's complaint, to infer that it continued to refine its patented technology such that Tappy incorporated trade secret refinements nowhere disclosed in patent applications.  But even if those patent applications disclosed every aspect of Tappy, the court could not reach that conclusion on its own based solely on a sheaf of patent applications and the allegations of T-Mobile's complaint.  It would need to compare the disclosures of the patent applications to the features of Tappy, something that likely requires expert testimony, but is in any event manifestly beyond the scope of a motion to dismiss for failure to state a claim.  Huawei asks the court to look at a few diagrams disclosed in the patent applications, note that they appear to resemble Tappy, and conclude that nothing about Tappy is a trade secret.  Even if the court could do that, it could not ignore that T-

ORDER – 7

Mobile has alleged facts that make it plausible to infer that Mr. Wang and Mr. Xiong misappropriated information that was not disclosed in any patent application or any other public source.  Why, for example, did Mr. Xiong steal an end effector and analyze it if he could have obtained the same information by looking at patent applications?  A plausible answer is that he could not, because the information he was taking was T-Mobile's trade secret.

The same concerns apply to the videos and photographs on which Huawei asks the court to rely.  They plainly disclose some aspects of Tappy.  But if they disclosed every aspect, why did Mr. Wang take surreptitious photographs?  Why behave furtively if he could obtain the same information by simply downloading videos?  Huawei-USA attaches to its motion to dismiss four photographs that it contends are the ones Mr. Wang took.  Even assuming that the court could accept that assertion on a motion to dismiss, there are obvious differences between the photographs and the videos to which Huawei points.  The court cannot, on a motion to dismiss, accept Huawei's bald assertion that the photos that Mr. Wang took without permission are no more illuminating than the videos.  A plausible inference is that Mr. Wang took the photos to obtain information he could not obtain in any public photos or videos of Tappy.

## 2.    T-Mobile Has Adequately Identified its Trade Secrets.

Apart from its argument that there is nothing secret about Tappy, Huawei contends that T-Mobile has failed to identify its purported trade secrets with sufficient particularity.  This argument plays on a tension often present in trade secret litigation.  A plaintiff looking to take unfair advantage of the UTSA might plead trade secret misappropriation without doing anything to identify what its trade secrets are.  If allowed to proceed to discovery on such a flimsy basis, the plaintiff could not only burden the defendant with the task of responding to broad discovery requests, but could also identify its trade secrets after the fact by tailoring its identification of trade secrets to the discovery it receives.  On the other hand, because it is the defendant who knows what it

ORDER – 8

1  misappropriated, a plaintiff should not be compelled to divulge with specificity all of its

2  possible trade secrets (especially not to a defendant who it believes has already

3  misappropriated at least one of them) in order to proceed to discovery.

4        T-Mobile has done enough to identify its trade secrets.  T-Mobile has identified at

5  least two aspects of Tappy that Huawei targeted with its misappropriation efforts:

6  information about the end effector, and the "sequence files" that govern Tappy's testing

7  steps.  As to the end effector, Huawei's claims that it cannot be expected to know what is

8  a trade secret are unconvincing.  Mr. Xiong stole an end effector, analyzed it, and sent the

9  results of that analysis to Huawei China.  T-Mobile may not know exactly why, and there

10  is no reason to force it to declare exactly which aspects of the end effector it believes are

11  secret.  Huawei will submit to discovery about what it learned about the end effector and

12  why.  As to the sequence files, T-Mobile's allegations as to who took them and how are

13  much more vague.  Nonetheless, Huawei cannot credibly claim that a claim of

14  unspecified trade secrets in the sequence files is unduly broad.  The court finds nothing

15  unreasonable about requiring Huawei to submit to discovery on that issue.

16       **3.**     **T-Mobile Has Adequately Alleged Efforts to Keep Its Trade Secrets Confidential.**

17        Huawei asks the court to conclude that T-Mobile has not adequately alleged

18  reasonable efforts to keep its trade secrets confidential.  Huawei is not at all persuasive.

19  T-Mobile described many security measures, including limits on access to its clean room,

20  limits on who could enter it, efforts to monitor what occurred in the clean room, and

21  efforts to immediately address Huawei's theft of information from the clean room.  That

22  is more than enough to plausibly allege reasonable efforts to protect its trade secrets.

23  Huawei points to other measures that T-Mobile could have taken, but that is immaterial

24  on a motion to dismiss.  Huawei's contention that T-Mobile's secrecy measures were

25  inadequate is one that it will need to make in front of a jury, not in a motion to dismiss.

26

27

28  ORDER – 9

**B.    T-Mobile Has Adequately Pleaded a Breach of Contract Claim Against Both Huawei USA and Huawei China.**

Huawei USA was a signatory to the 2010 supply agreement, the 2012 non-disclosure agreement, the 2012 Clean Room Letter, and a supply agreement with another mobile phone network provider whose contractual rights T-Mobile has now acquired.  T-Mobile alleges that all of those agreements contain clauses protecting its confidential information, and that Huawei USA breached all of them.  That is adequate to state a breach of contract claim, and Huawei USA has not convinced the court that it needs more specific allegations as to precisely which aspects of those contracts it breached.

Huawei USA also contends that the court should dismiss the breach of contract claim because it seeks damages that are duplicative of the damages T-Mobile seeks for misappropriation of its trade secrets.  Even if the damages were wholly duplicative, that is no basis at all for dismissing the claim.  Jury instructions will ensure that T-Mobile does not receive a duplicative damage award; there is no basis to preclude T-Mobile from showing that the same acts constituted both misappropriation of trade secrets and breach of contract.

T-Mobile's claim that Huawei China breached contracts introduces another complication: Huawei China did not sign any of the contracts T-Mobile describes in its complaint.  Nonetheless, T-Mobile points out that the non-disclosure agreement contains a clause in which Huawei USA agreed that it was signing on behalf of Huawei China.  Huawei China contends that agency principles dictate that its subsidiary could not bind it.  That argument, like all of the arguments Huawei China raises to avoid the breach of contract claim, depends on facts well beyond the scope of T-Mobile's complaint.[2]  Huawei China is welcome to present those facts at trial or in a motion where it is

---

[2] Huawei China asserts, for example, that its not actually Huawei USA's parent company, but rather the joint owner of another company that is the parent of another company that is itself Huawei USA's parent.  Def.'s Reply (Dkt. # 59) at 1 n.1.  The court cannot accept Huawei China's assertion on a motion to dismiss.  It must instead accept T-Mobile's allegation that Huawei USA is Huawei China's wholly-owned subsidiary.  ¶ 24.

ORDER – 10

1    permitted to present evidence outside the scope of the complaint.  On a motion to

2    dismiss, its arguments are not sufficient.

3    **C.    T-Mobile Has Adequately Pleaded that Huawei China Interfered With Its
          Business Relationships.**

        Perhaps recognizing that Huawei China is not bound to some or all of the contracts

     to which Huawei USA bound itself, T-Mobile asserts that Huawei China is liable for

     tortiously interfering with those contracts or with business expectancies.  A tortious

     interference claim is comprised of the following elements:

> (1) the existence of a valid contractual relationship or business expectancy;
> (2) that defendants had knowledge of that relationship; (3) an intentional
> interference inducing or causing a breach or termination of the relationship
> or expectancy; (4) that defendants interfered for an improper purpose or
> used improper means; and (5) resultant damage.

     *Leingang v. Pierce County Medical Bureau*, 930 P.2d 288, 300 (Wash. 1997).

        Huawei China offers four arguments in an effort to win dismissal of T-Mobile's

     tortious interference claim.  The first is that the interference claim depends on T-Mobile's

     claim of trade secret misappropriation, and fails for the same reasons.  Because the court

     has already concluded that T-Mobile has adequately pleaded trade secret

     misappropriation, it need not consider this argument further.  The second is that T-

     Mobile's allegation that it interfered with "other applicable agreements" (¶ 99) is

     insufficiently particularized.   That is unconvincing, because the same allegation states

     that Huawei China interfered with the 2012 supply agreement and the Clean Room

     Letter.  ¶ 99.  Even if the reference to "other applicable agreements" were too vague, that

     would not undermine a claim as to the 2012 supply agreement and the Clean Room

     Letter.  T-Mobile's allegations suffice to inform Huawei China that it is being sued for

     interfering with any agreement that imposes confidentiality obligations on Huawei USA.

     That suffices.  Huawei China's third argument is that the UTSA preempts T-Mobile's

     tortious interference claim.  The court will address that argument in Part III.E, *infra*.

ORDER – 11

1   What remains is Huawei China's contention that it cannot, as a matter of law, be

2   liable for interfering with the contractual relationships of its subsidiary.  That argument

3   relies entirely on *Hansen v. Transworld Wireless TV-Spokane, Inc.*, 44 P.3d 929 (Wash.

4   Ct. App. 2002).  In *Hansen*, the court considered a tortious interference claim in the wake

5   of the breach of a contract to buy the assets of a local wireless cable television company.

6   44 P.3d at 932.  The local company was the wholly-owned subsidiary of its parent

7   company, the parent company was the two-thirds-owned subsidiary of another company,

8   and that company was in turn the wholly-owned subsidiary of a Canadian corporation.

9   *Id.*  After the plaintiff believed he had reached a contract to purchase the local company's

10  assets, its parent's board made an about face and instead sold the local company to

11  another purchaser.  *Id.* at 932-33.  The plaintiff sued the local company for breach of

12  contract, and all of its parent, grandparent, and great-grandparent companies for tortious

13  interference.  *Id.* at 933.  Adopting non-Washington authority establishing that "a

14  corporate parent is not always liable in tort for interfering with the affairs of a

15  subsidiary," *id.* at 935-36, the *Hansen* court held that the trial court did not err in granting

16  summary judgment against the tortious interference claim.  *Id.* at 933, 936.  It explained

17  that there was no factual dispute that the "financial interests of [the parent companies and

18  the local company] were identical," and thus held that the parent companies were

19  permitted to interfere with the local company's contractual relationships.  *Id.* at 936.

20  At this stage, the court expresses no view on whether Huawei China, like the

21  parent companies in *Hansen*, was privileged to interfere with the contracts between

22  Huawei USA and T-Mobile.  The *Hansen* court did not purport to define the boundaries

23  of the privilege it extended to the parent companies before it.  So far as the court is aware,

24  only one court in Washington has even considered applying *Hansen*'s holding.  In

25  *NTCH-WA, Inc. v. ZTE Corp.*, No. 12-CV-3110-TOR, 2014 U.S. Dist. LEXIS 26287, at

26  *23 (E.D. Wash. Feb. 27, 2014), the court declined to apply *Hansen* on a motion to

27  dismiss, noting that whether the parent-subsidiary "economic interests were aligned is a

28  ORDER – 12

question of fact which is not susceptible to resolution on a motion to dismiss." In this case, it is plausible that whereas Huawei USA highly valued its economic interest in maintaining its supplier relationship with T-Mobile, Huawei China saw that interest as less valuable than building a testing robot that it could use for all of the handsets that its subsidiaries supplied to all purchasers, not only to T-Mobile. Without evidence to flesh out the alignment of interests between the Huawei entities, the court declines to decide the applicability of *Hansen*.

**D.   T-Mobile Has Not Pleaded a CPA Claim.**

A CPA claim requires a plaintiff to prove "(1) [an] unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact, (4) [an] injury to plaintiff in his or her business or property, [and] (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins.*, 719 P.2d 531, 523 (Wash. 1986). Both Huawei entities contend that T-Mobile has failed to plead an unfair or deceptive act, that it has failed to allege a public interest impact, and that the UTSA preempts its CPA claim.

The court quickly dispenses with Huawei's first argument. It contends that the only "unfair or deceptive act" T-Mobile has alleged is the misappropriation of its trade secret, and that this allegation fails for the same reasons that T-Mobile fails to allege misappropriation. The court has already concluded that T-Mobile has pleaded a claim for trade secret misappropriation.

As to whether T-Mobile has pleaded a public interest impact, the court returns to *Hangman Ridge*, where the Washington Supreme Court declared that "it is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes a factual pattern from a private dispute to one that affects the public interest." 719 P.2d at 538. T-Mobile attempts to plead a public interest impact by pointing to Huawei's "pattern of disregard for the intellectual property rights of other entities and companies in the United States." ¶ 21. That quote, according to T-Mobile, is lifted from the United States "House of Representatives Permanent Select Committee on

ORDER – 13

Intelligence," which allegedly investigated Huawei in November 2011. ¶ 76. Although T-Mobile alleges that Huawei has a "documented history of violating security and confidentiality protocols in order to steal technology or obtain other competitive advantages," ¶ 74, the only other specific allegation is that an expert concluded that Huawei misappropriated unspecified "source code" from "Cisco" in 2003, then denied wrongdoing in 2012. ¶¶ 77-78. The court can draw no inference about what Huawei did to misappropriate Cisco's source code or to earn the disapproval of a committee of the House of Representatives. It therefore cannot reach a plausible inference that Huawei has already injured or is likely to injure additional plaintiffs in "exactly the same fashion" as it allegedly injured T-Mobile.

T-Mobile fares no better after consideration of factors that courts have used to guide their inquiry into a public interest impact sufficient for a CPA claim. In cases not involving a consumer transaction, those factors are as follows:

> (1) Were the alleged acts committed in the course of defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions?

*Stephens v. Omni Ins. Co.*, 159 P.3d 10, 24 (Wash. Ct. App. 2007) (noting that "[n]o one factor is dispositive, nor it necessary that all be present"). T-Mobile's complaint offers formulaic recitations of the first three of those factors, ¶ 109, but those labels do not give rise to a plausible inference of public interest impact. Although Huawei committed its allegedly wrongful acts in the course of its business, the remaining factors square poorly with T-Mobile's allegations. Huawei's misconduct is not the result of the supplier relationship that it arguably solicited (and may solicit from other businesses), but rather the result of its desire to acquire a specific technology that it discovered in the course of that relationship. That relationship, moreover, was one between two presumably well-heeled corporations, not one in which bargaining power was unequal. The dispute that T-Mobile has pleaded is, the court concludes, a private one.

ORDER – 14

As an alternative to demonstrating (or pleading) an impact on the public interest, a CPA plaintiff can establish a per se public interest impact by "showing that a statute has been violated which contains a specific legislative declaration of public interest impact." *Hangman Ridge*, 719 P.2d at 538.[3]  T-Mobile attempts to satisfy this alternative requirement by pointing to RCW 4.24.601.  That statute is not part of the UTSA, but rather part of an act relating to public access to information about product liability and hazardous substances claims.  RCW 4.24.601, 4.24.611.  The legislature declared, in that context, that "the protection of trade secrets, other confidential research, development, or commercial information concerning products or business methods promotes business activity and prevents unfair competition."  RCW 4.24.601.  It thus declared that it was a "matter of public policy that the confidentiality of such information be protected and its unnecessary disclosure be protected."  *Id*.  That contrasts poorly with other statutes with legislative declarations that establish a per se public interest impact.  *E.g.*, RCW 19.182.150 (declaring, as to Washington Fair Credit Reporting Act, that "the practices covered by this chapter are matters vitally affecting the public interest for the purpose of applying the consumer protection act"), RCW 46.70.310 (declaring, as to the Auto Dealers Practice Act, that "[a]ny violation of this chapter is deemed to affect the public interest"), RCW 48.01.030 (declaring that "[t]he business of insurance is one affected by the public interest").  The UTSA itself contains no declaration of public interest impact. The court concludes that RCW 4.24.601 does not contain a declaration of public interest impact sufficient to make misappropriation of a trade secret an act with a per se public interest impact.

---

[3] A plaintiff may also establish public interest by showing a violation of a "statute that incorporates [the CPA]."  RCW 19.86.093(1).  T-Mobile does not allege that Huawei violated a statute that incorporates the CPA.

ORDER – 15

**E.      The UTSA Preempts the Tortious Interference Claim that T-Mobile Pleaded Against Huawei China.**

The UTSA declares that it "displaces conflicting tort, restitutionary, and other law of this state pertaining to civil liability for misappropriation of a trade secret." RCW 19.108.900.  It does not preempt "[c]ontractual or other civil liability or relief that is not based upon misappropriation of a trade secret . . . ."  RCW 19.108.900(2)(a).

As the court previously noted, Huawei China argues that the UTSA preempts T-Mobile's tortious interference claim.  Both Huawei entities argue that the UTSA preempts T-Mobile's CPA claim, an argument that the court will not consider in light of its dismissal of the CPA claim.

The preemptive scope of the UTSA has received little attention in Washington's state courts.  The Washington Supreme Court has cited RCW 19.108.900 just twice.  *Boeing v. Sierracin Corp.*, 738 P.2d 665, 673 (Wash. 1987); *Ed Nowogroski Ins., Inc. v. Rucker*, 971 P.2d 936, 945 & n.5 (Wash. 1999).  The most comprehensive analysis of the scope of that statute by a state court comes in *Thola v. Henschell*, 164 P.3d 524 (Wash. Ct. App. 2007).

*Thola* considered an appeal from a jury trial in a dispute between two owners of chiropractic clinics after a chiropractor left plaintiff's clinic and began working at defendant's clinic.  164 P.3d at 527.  The jury found the chiropractor liable for violating the UTSA by misappropriating a "confidential client list" and found the owner of clinic to which she moved vicariously liable for that violation and for tortiously interfering with her previous employer's business relationships.  *Id.*  Considering whether the UTSA preempted the tortious interference claim, the *Thola* court adopted what this court will call a "strong" view of the preemptive scope of the UTSA.  It ruled that a plaintiff "may not rely on acts that constitute trade secret misappropriation to support other causes of action."  *Id.* at 530 (quoting *Ed Nowogroski Ins., Inc. v. Rucker*, 944 P.2d 1093, 1097

ORDER – 16

(Wash. Ct. App. 1997).[4]  It offered a three-step analysis to determine whether a claim is preempted:

> (1) assess the facts that support the plaintiff's [non-UTSA] civil claim, (2) ask whether those facts are the same as those that support the plaintiff's UTSA claim, and (3) hold that the UTSA preempts liability on the civil claim unless the common law claim is factually independent from the UTSA claim.

*Thola*, 164 P.3d at 530.  Applying that analysis, the court concluded that the plaintiff's tortious interference claim was not preempted because it was based, at least in part, on evidence that the chiropractor had used appointments with patients at the plaintiff's clinic to solicit those patients to take their business to the defendant's clinic.  *Id.*  Because the solicitation did not involve the misappropriation of trade secrets, the UTSA did not preempt the tortious interference claim *to the extent it relied on that act*.  The court ordered a retrial, however, because the jury was not instructed on preemption:

> [T]he trial court should have instructed the jury that it could not consider evidence of [the chiropractor]'s acts of trade secret misappropriation when it deliberated on [plaintiff]'s common law actions.

> The trial court's failure to instruct the jury that the law prohibits using the trade secret violation evidence to prove [plaintiff]'s other claims prejudiced [defendant].  Because the court did not instruct on the limits of this evidence, it is highly likely that the jury did as [plaintiff] urged and used the trade secret violation evidence to find for [plaintiff] on her other claims.  Upon retrial, the trial court must properly instruct the jury on preemption and the limited use of trade secret misappropriation evidence.

*Id.* at 531 (internal citation omitted).

But even as the *Thola* court took a strong view of the preemptive scope of the UTSA in Washington, it acknowledged a weaker view:

> In some jurisdictions, a common law claim is not preempted if the elements require some allegation or factual showing beyond those required under the UTSA.  *Mortgage Specialists*[, *Inc. v. Davey*], 153 N.H. [764,] 778 [(N.H. 2006)].  But we do not adopt this view of the UTSA at this time because our court did not adopt this reasoning in *Rucker I*, addressing only factual preemption, and neither [plaintiff] nor [defendant] briefs this issue.

164 P.3d at 530 n.4.

---

[4] The Washington Supreme Court affirmed the lower appellate court in *Nowogroski*, but the lower court's preemption ruling was not at issue on appeal.  *Nowogroski*, 971 P.2d at 941.

ORDER – 17

The distinction between the weak and strong views of the preemptive scope of the UTSA matters in this case because T-Mobile's tortious interference claim would survive under the former but not under the latter.  T-Mobile has not articulated a set of facts it could rely on to prove its tortious interference claim that is wholly independent of those it will rely on to prove trade secret misappropriation.  So far as its complaint reveals, it will prove Huawei China's tortious interference by proving that Huawei China induced Huawei USA to breach its contractual obligations by stealing trade secrets.  On the other hand, there is no question that T-Mobile's tortious interference claim requires proof of elements that "require some allegation or factual showing beyond those required under the UTSA." *Thola*, 164 P.3d at 530 n.4.  At a minimum, the tortious interference claim requires T-Mobile to prove the existence of a contractual relationship or business expectancy, which is not an element of a trade secret claim.

So far as the court is aware, only one court applying Washington law has taken the weaker view of the preemptive scope of the UTSA that the *Thola* court acknowledged. *LaFrance Corp. v. Werttemberger*, No. C07-1932Z, 2008 U.S. Dist. LEXIS 98741, at *6-8 (W.D. Wash. Nov. 24, 2008).  Every other court to consider the issue has applied *Thola*'s stronger view.  *E.g.*, *Ultimate Timing, L.L.C. v. Simms*, 715 F. Supp. 2d 1195, 1208 (W.D. Wash. 2010) (Pechman, J.); *Baden Sports, Inc. v. Wilson Sporting Goods Co.*, No. C11-603MJP, 2011 U.S. Dist. LEXIS 81433, at *6-7 (W.D. Wash. Jul. 26, 2011), *Int'l Paper Co. v. Stuit*, No. C11-2139JLR, 2012 U.S. Dist. LEXIS 70583, at *18-25 (W.D. Wash. May 21, 2012); *Enterprises Int'l, Inc. v. Int'l Knife & Saw, Inc.*, No. C12-5638BHS, 2013 U.S. Dist. LEXIS 168289, at *23-29 (W.D. Wash. Nov. 26, 2013); *Fidelitad, Inc. v. Insitu, Inc.*, No. 13-CV-3128-TOR, 2014 U.S. Dist. LEXIS 151334, at *7-11 (E.D. Wash. Oct. 24, 2014); *Kforce Inc. v. Oxenhandler*, No. C14-774MJP, 2015 U.S. Dist. LEXIS 54101, at *9-12 (W.D. Wash. Apr. 24, 2015); *Omega Morgan, Inc. v. Heely*, No. C14-556RSL, 2015 U.S. Dist. LEXIS 56288, at *11-19 (W.D. Wash. Apr. 29, 2015).  In *Stuit*, the court noted that the decision in *LaFrance* relied on that court's view

ORDER – 18

that the weight of authority in jurisdictions using the UTSA supported the adoption of the weaker view of that Act's preemptive scope.[5]  *Stuit*, 2015 U.S. Dist. LEXIS 70583, at *24-25; *LaFrance*, 2008 U.S. Dist. LEXIS 98741, at *7.  The *Stuit* court, relying on more recent UTSA decisions in other jurisdictions, concluded that the "weight of authority has tipped away from the so-called 'elements' test adopted by the court in *LaFrance*."  2012 U.S. Dist. LEXIS 70583, at *24.

This court applies the stronger form of preemption that the *Thola* court embraced, because the court's best prediction is that the Washington Supreme Court would embrace that view, and not the weaker form of preemption, if it were called upon to make a choice between those views.  As the court has already explained, there are no allegations in T-Mobile's complaint that indicate that it can prove tortious interference without relying on the same facts that support its trade secret claim.  The court therefore dismisses the tortious interference claim, although it will not prohibit T-Mobile from repleading it.[6]

---

[5] Washington courts endeavor to construe this state's version of the UTSA "to achieve uniformity among [the 46 other] jurisdictions that have enacted" some version of it.  *Thola*, 164 P.3d at 528; RDW 19.108.910.

[6] T-Mobile relies on at least one case in which the court acknowledged that even when applying the stronger view of the preemptive scope of the UTSA, it is not necessarily appropriate to dismiss a non-trade-secret common-law claim that relies on the same core of facts as a trade secret claim.  In *Fidelitad*, the court declined to dismiss a tortious interference claim that depended on the same facts as a trade secret claim, because it was possible that a finder of fact would conclude that the misappropriated information was not in fact a trade secret.  2014 U.S. Dist. LEXIS 151334, at *9-11.  In this case, it is not out of the question that a finder of fact could conclude that whereas Huawei took confidential information protected by T-Mobile's contracts with Huawei USA, that confidential information was not a trade secret.  If so, T-Mobile might prevail on a tortious interference claim without prevailing on its trade secret claim.  Because T-Mobile did not articulate this view, and the allegations of its complaint do not support it, the court does not consider the issue further.

Should T-Mobile attempt to restate a tortious interference claim based on that theory, the parties must consider that several courts applying Washington's UTSA have held that the Act preempts even claims that rely on proof of misappropriation of confidential-but-not-trade-secret information.  So far as the court is aware, the *Stuit* court was the first to take that view.  2012 U.S. Dist. LEXIS 70583, at *22 (noting that "the UTSA's preemption provision has generally been interpreted to abolish all free-standing alternative causes of action for theft or misuse of confidential, proprietary, or otherwise secret information *falling short of trade secret status*") (quoting *CDC Restoration & Constr., LC v. Tradesmen Contractors, LLC*, 274 P.3d 317, 329 (Utah Ct. App. 2012)) (emphasis added).  Other courts have, however, taken the same view.  *E.g.*, *Enterprises Int'l*, 2013 U.S. Dist. LEXIS 168289, at *25-27; *Kforce*, 2015 U.S. Dist. LEXIS 54101, at *10-11.

ORDER – 19

## IV.   ANALYSIS OF HUAWEI CHINA'S RULE 12(B)(2) MOTION

When a defendant invokes Federal Rule of Civil Procedure 12(b)(2) in a motion to dismiss for lack of personal jurisdiction, the plaintiff must make a prima facie showing of personal jurisdiction. *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1128-29 (9th Cir. 2003). A plaintiff builds a prima facie case by stating facts that, if true, would support the court's exercise of jurisdiction. *Id.* at 1129. The court need not accept a plaintiff's bare allegations if the defendant controverts them with evidence. *See AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996). If the parties provide competing evidence as to a fact, however, the court must resolve competing inferences in the plaintiff's favor. *Harris Rutsky*, 328 F.3d at 1129. If appropriate, the court must grant a party's request for an evidentiary hearing to determine personal jurisdiction. *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1284-85 (9th Cir. 1977). No one has requested an evidentiary hearing in this case.

### A.   Personal Jurisdiction Basics

In a case like this one, where no federal statute governs personal jurisdiction, the court's jurisdictional analysis starts with the "long-arm" statute of the state in which the court sits. *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002). Washington's long-arm statute (RCW 4.28.185) extends personal jurisdiction to the broadest reach that the Due Process Clause of the federal Constitution permits. *Shute v. Carnival Cruise Lines*, 783 P.2d 78, 82 (Wash. 1989).

There are two species of personal jurisdiction: specific and general. *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). Both species depend on the defendant's contacts with the forum. "[S]pecific jurisdiction is tethered to a relationship between the forum and the claim," whereas general jurisdiction is not. *Holland Am. Line, Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 460 (9th Cir. 2007). A defendant with "substantial" or "continuous and systematic" contacts with the forum state is subject to general jurisdiction, and can be haled into court on any action, even one

ORDER – 20

1   unrelated to its contacts in the state. *Bancroft & Masters*, 223 F.3d at 1086. A defendant

2   not subject to general jurisdiction may be subject to specific jurisdiction if the suit against

3   it arises from its contacts with the forum state. *Id.* T-Mobile does not assert that Huawei

4   China is subject to general jurisdiction in Washington; the court therefore considers only

5   whether Huawei China is subject to specific jurisdiction.

6   **B.    Evidence Relevant to Personal Jurisdiction Over Huawei China**

7            As the court has noted, Huawei China's invocation of Rule 12(b)(2), unlike its

8   invocation of Rule 12(b)(6), permits it to go beyond the allegations of T-Mobile's

9   complaint to introduce evidence relevant to the court's jurisdictional analysis. Huawei

10  took advantage of that opportunity to submit a single declaration from a representative

11  who declares that Huawei China has no physical presence in Washington and has not

12  transacted business here. Xu Decl. (Dkt. # 55) ¶¶ 5-11. She also asserts that none of the

13  Huawei employees identified in T-Mobile's complaint, including Mr. Wang and Mr.

14  Xiong, were employed by Huawei China at any relevant time. *Id.* ¶¶ 11-13. The latter

15  evidence, however, is contradicted by Huawei's admission that the decision to discipline

16  Mr. Wang and Mr. Xiong was made in part by Huawei China executives. Stipulation

17  (Dkt. # 60-1) ¶ 2. The same stipulation admits that Huawei China took "corrective and

18  disciplinary actions" against the people who supervised Mr. Wang and Mr. Xiong,

19  including demoting personnel at both Huawei USA and Huawei China. *Id.* ¶ 5. From

20  these admissions, the court can take the reasonable inference that Huawei China

21  exercised control over the Huawei personnel who actually committed misconduct in T-

22  Mobile's Bellevue facilities. Other inferences are possible, but the court is required at

23  this stage to take only the inferences that favor T-Mobile.

24           What is missing from Huawei China's evidence is anything to contradict T-

25  Mobile's allegation that it "directed both its own employees and Huawei USA employees

26  to steal . . . information from T-Mobile." ¶ 17. The closest Huawei China comes to

27  contradicting that evidence is a generic assertion that it "did not engage in any activities

28  ORDER – 21

in the State of Washington as alleged in the complaint." Xu Decl. (Dkt. # 55) ¶ 14.[7]  But

T-Mobile's claims do not depend on the allegation that Huawei China took actions in

Washington, they depend on the allegation that Huawei China directed from afar the

Bellevue misconduct of Mr. Xiong, Mr. Wang, and others.  That uncontradicted

allegation, as the court will now discuss, is a sufficient basis for the court's exercise of

personal jurisdiction over Huawei China.

**C.**  **T-Mobile Passes The Three-Part Test for the Court's Exercise of Specific Jurisdiction Over Huawei China.**

A three-part test determines whether the assertion of specific jurisdiction over a

defendant comports with the Due Process Clause:

1)  The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or [a] resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

2)  the claim must be one which arises out of or relates to the defendant's forum-related activities; and

3)  the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (quoting

*Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)).  The plaintiff bears the burden as to

the first two parts of the test.  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218,

1228 (9th Cir. 2011).  If the plaintiff meets that burden, the burden shifts to the defendant

to make a "compelling case" that the exercise of jurisdiction is unreasonable.  *Id.*

(quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

In the first part of the specific jurisdiction test, purposeful availment and

purposeful direction are "two distinct concepts." *Schwarzenegger*, 374 F.3d at 802.  In

[7] Huawei China's motion to dismiss contains a different assertion, that it was "not involved in the actions set forth in the Complaint."  Def.'s Mot. (Dkt. # 54) at 6.  No evidence supports that assertion.  Even if Huawei China had supported that assertion with evidence, however, the court would permit T-Mobile at least limited discovery to test that assertion.

ORDER – 22

1    the Ninth Circuit, tort cases typically require a purposeful direction analysis, whereas

2    contract cases typically require a purposeful availment analysis.  *Washington Shoe Co. v.*

3    *A-Z Sporting Goods, Inc.*, 704 F.3d 668, 672-73 (9th Cir. 2012).  Much of Huawei

4    China's evidence tends to show that it did not purposefully avail itself of the privilege of

5    conducting activity in Washington.  T-Mobile's allegations, however, are allegations of

6    tortious activity (*e.g.*, the misappropriation of trade secrets) *directed* at Washington.[8]

7    The court thus considers whether Huawei China purposefully directed conduct at

8    Washington.  That requires consideration of the "effects" test for purposeful direction

9    from *Calder v. Jones*, 465 U.S. 783 (1984).  *Washington Shoe Co. v. A-Z Sporting*

10   *Goods, Inc.*, 704 F.3d 668, 673-79 (9th Cir. 2012).  That test is as follows:

11          The defendant allegedly [must] have (1) committed an intentional act, (2)
             expressly aimed at the forum state, (3) causing harm that the defendant
12           knows is likely to be suffered in the forum state.

13   *Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1206 (9th Cir. 2006)

14   (quoting *Schwarzenegger*, 374 F.3d at 803).  Where a plaintiff passes the effects test, a

15   court "may exercise personal jurisdiction over a defendant who engages in an intentional

16   act that causes harm in the forum state, even if that act takes place outside of the forum

17   state."  *Washington Shoe*, 704 F.3d at 673.

18          T-Mobile's allegations satisfy the effects test as to Huawei China.  T-Mobile has

19   adequately alleged that Huawei China acted intentionally.  Its allegations plausibly state

20   that Huawei China intended to misappropriate its technology so that it could build its own

21   testing robot.  To accomplish that plan, T-Mobile asserts Huawei China directed others

22   (like Mr. Wang and Mr. Xiong) to misappropriate information from T-Mobile's Bellevue

23   testing facility.  That is activity expressly aimed at Washington.  To the extent that

24   Huawei China believes that its evidence that it disciplined Mr. Xiong, Mr. Wang and

25
26   [8] T-Mobile has no obligation to show that Huawei China is subject to personal jurisdiction as to
     each of its claims.  The court has "pendent personal jurisdiction" over all claims related to a
     claim that gives rise to personal jurisdiction.  *Action Embroidery Corp. v. Atl. Embroidery, Inc.*,
27   368 F.3d 1174, 1180 (9th Cir. 2004).  All of T-Mobile's claims are sufficiently related to its
     trade secret claim.

28   ORDER – 23

others is sufficient to demonstrate that it did not direct their misconduct, it is mistaken. One could plausibly infer that Huawei China disciplined them because they acted, independently, in a wrongful manner.  But one could also plausibly infer that Huawei China disciplined them only to give the appearance that it had not directed their activities. Again, the court is compelled at this stage to accept the inferences that favor T-Mobile. As to the last element of the effects test, T-Mobile has adequately alleged that Huawei China knew that the Washington activity it directed from China would harm T-Mobile in Washington.

As to the second part of the personal jurisdiction analysis, there is no question that the claims against Huawei China arise out of the activity that it directed at Washington.

That brings the court to the third part of the jurisdictional analysis, where it is Huawei China's burden to show that the exercise of personal jurisdiction over it would be unreasonable.  Huawei China did not attempt to discharge that burden.  The court is aware of no reason that its exercise of jurisdiction over Huawei China would be unreasonable.  *See Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1487-88 (9th Cir. 1993) (listing seven factors relevant to reasonableness of exercise of personal jurisdiction); *see also Bancroft & Masters*, 223 F.3d at 1088 (noting that it is defendant's burden to make a "compelling case" of unreasonableness).

### V.   CONCLUSION

For the reasons previously stated, the court GRANTS Huawei USA's motion to dismiss (Dkt. # 32) in part and denies it in part, dismissing only T-Mobile's CPA claim. The court GRANTS HUAWEI China's motion to dismiss (Dkt. # 54) in part and denies it in part, dismissing only T-Mobile's tortious interference claim without prejudice.

DATED this 14th day of July, 2015.

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 24