HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

T-MOBILE USA, INC., a Delaware
corporation,

        Plaintiff,

   v.

HUAWEI USA, INC., a Texas corporation,

        Defendant.

Case No. 14-cv-01351-RAJ

**T-MOBILE USA, INC.'S
TRIAL BRIEF**

**TRIAL DATE: FEB. 21, 2017**

**[PUBLIC REDACTED VERSION]**

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ............................................................. 1

II.    SUMMARY OF EVIDENCE ........................................................... 5

    A.    T-Mobile's Tappy Testing System Is Unique And Valuable ............................ 5

    B.    Huawei USA Accessed TTS To Test Devices For T-Mobile Under NDA .......... 5

    C.    Huawei USA And Huawei Device China Employees Schemed To Steal Trade Secret Information About The TTS ........................................................... 6

    D.    The Evidence Shows Huawei Entities Used T-Mobile's Trade Secrets To Create, And Profit From, Its Own Copycat Robot .................................................. 8

III.    ARGUMENT ............................................................................. 9

    A.    Huawei USA Is Liable For Damages And All Unjust Enrichment Caused By Its Misappropriation And Breaches Of Contract ............................................ 9

        1.    The Jury May Award All Unjust Enrichment Damages Caused By Huawei USA's Misappropriation ........................................................... 10

        2.    The Jury May Award Damages For The Wrongful Conduct Of Huawei USA And Its Joint Tortfeasors .................................................. 11

        3.    Huawei USA Is Liable For Its Affiliates' Breaches ............................. 14

        4.    The Jury May Award A Reasonable Royalty ........................................ 15

    B.    The Court Should Award Exemplary Damages To T-Mobile ........................... 19

    C.    Estoppel Is Not A Valid Defense To Misappropriation ..................................... 20

IV.    REMAINING ISSUES REQUIRING ACTION BY THE COURT ............................. 20

    A.    The Court Should Exclude Huawei USA's Late-Disclosed Witnesses ............. 20

    B.    Use Of Foreign-Language Documents Should Be Streamlined ........................ 22

    C.    Ex Parte Discussions With Court Interpreter Should Not Be Permitted ........... 24

**Cases**

*Advanced Tech. Incubator, Inc. v. Sharp Corp.*,
    701 F. Supp. 2d 861 (E.D. Tex. 2010) ................................................................... 24

*Allied Erecting & Dismantling Co. v. Genesis Equip. & Manufac., Inc.*,
    511 Fed. Appx. 398 (6th Cir. 2013) ....................................................................... 14

*Becker Family Builders Co-Plaintiffs Grp. v. F.D.I.C.*,
    No. C09-5477RJB, 2010 WL 3672352 (W.D. Wash. Sept. 14, 2010) .................. 13

*Benjamin v. B&H Education, Inc.*,
    2015 WL 6164891 (N.D. Cal. Oct. 16, 2015) ....................................................... 21

*Boeing Co. v. Sierracin Corp.*,
    108 Wn.2d 38 (1987) .............................................................................................. 19

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
    576 F.3d 1348 (Fed. Cir. 2009) .............................................................................. 18

*CKP, Inc. v. GRS Constr. Co.*,
    63 Wash. App. 601 (1991) ...................................................................................... 12

*Clark v. Bunker*,
    453 F.2d 1006 (9th Cir. 1972) ................................................................... 3, 11, 14

*Dodson v. Economy Equip. Co.*,
    188 Wash. 340 (1936) ............................................................................................... 4

*Elliot v. Barnes*,
    32 Wash. App. 88 (1982) ............................................................................ 3, 11, 12

*F&G Scrolling Mouse, L.L.C. v. Key Tronic Corp.*,
    No. 2:99-cv-00995-JCC (W.D. Wash. Dec. 20, 2001) ........................................ 20

*F.T.C. v. AMG Servs., Inc.*,
    2014 WL 317781 (D. Nev. Jan. 28, 2014) ............................................................ 21

*Gass v. McPherson's Inc. Realtors*,
    79 Wash. App. 65 (1995) ........................................................................................ 11

*Hewson Constr., Inc. v. Reintree Corp.*,
    101 Wash.2d 819 (1984) ........................................................................................ 12

*HomeStreet, Inc. v. State, Dep't. of Revenue*,
    166 Wash.2d 444 (2009) .............................................................................. 3, 10

*Inventio AG v. Thyssenkrupp Elevator Am. Corp.*,
    2013 WL 6628007 (D. Del. Dec. 13, 2013) ......................................................... 18

*LinkCo, Inc. v. Fujitsu Ltd.*,
    232 F. Supp. 2d 182 (S.D.N.Y. 2002) ............................................................ 16, 17

*Mangren R&D Corp. v. National Chemical Co.*,
　87 F.3d 937 (7th Cir. 1995) ........................................... 3, 10, 19

*McCormack & Dodge Corp. v. ABC Mgmt. Sys., Inc.*,
　222 U.S.P.Q. 432 (Wash. Super. Ct. 1983) ........................... 10

*Oculus Innovative Scis., Inc. v. Nofil Corp.*,
　No. C 06-01686 SI, 2007 WL 205068 (N.D. Cal. Jan. 25, 2007)........................................ 11

*Ollier v. Sweetwater Union High Sch. Dist.*,
　768 F.3d 843 (9th Cir. 2014) ............................................. 22

*PMC, Inc. v. Kadisha*,
　78 Cal. App. 4th 1368 (Cal. Ct. App. 2000) ...................... 11

*Salton, Inc. v. Philips Domestic Appliances & Pers. Care B.V.*,
　391 F.3d 871 (7th Cir. 2005) ............................................. 11

*Standing Rock Homeowners Ass'n v. Misich*,
　106 Wash. App. 231 (2001) .......................................... 3, 11, 12

*State v. J.M.*,
　144 Wash.2d 472 (2001)................................................... 3

*Storagecraft Tech. Corp. v. Kirby*,
　744 F.3d 1183 (10th Cir. 2014) ...................................... 16, 17, 18

*Straitshot Comms, Inc. v. Telekenex, Inc.*,
　No. 2:10-cv-00268-TSZ (W.D. Wash. Feb. 6, 2012) ........... 20

*Summit Prop. Int'l, LLC v. Ladies Prof. Golf Ass'n*,
　2010 WL 4983179 (S.D.N.Y. Dec. 6, 2010) ...................... 14

*Synergy GreenTech Corp. v. Magna Force, Inc.*,
　2016 WL 4198547 (W.D. Wash. Aug. 8, 2016) ................. 3, 12

*Ultimate Timing, L.L.C. v. Simms*,
　No. 2:08-cv-01632-MJP (W.D. Wash. July 2, 2010) ......... 20

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*,
　425 F.3d 1366 (Fed. Cir. 2005)........................................ 18

*United States v. Font-Ramirez*,
　944 F.2d 42 (1st Cir. 1991) ............................................. 23

*United States v. Fuentes-Montijo*,
　68 F.3d 352 (9th Cir. 1995) ............................................. 23

*United States v. Onori*,
　535 F.2d 938 (5th Cir. 1976) ........................................... 23

*University Computing Co. v. Lykes-Youngstown Corp.*,
    504 F.2d 518 (5th Cir. 1974) ............................................................... 15, 16

*Veritas Operating Corp. v. Microsoft Corp.*,
    No. C06-0703-JCC, 2008 WL 7404617 (W.D. Wash. Feb. 26, 2008)................................ 15

*Vieste, LLC v. Hill Redwood Dev.*,
    2011 WL 2181200 (N.D. Cal. June 3, 2011) ............................................................. 21

*Washburn v. Beatt Equip. Co.*,
    120 Wash. 2d 246 (1992)........................................................................ 12

*Wyeth v. Nat. Biologics, Inc.*,
    2003 WL 22282371 (D. Minn. Oct. 2, 2003),
    *aff'd*, 395 F.3d 897 (8th Cir. 2005).................................................................. 20

*Y.J.D Rest. Supply Co. v. DIB*,
    413 N.Y.S.2d 835 (Sup. Ct. 1979) ....................................................................... 15

**Statutes & Treatises**

16 Wash. Prac., Tort Law And Practice § 13:11 (4th ed.)..................................................... 12

25 Wash. Prac., Contract Law And Practice § 14:7 (3d ed.) ........................................... 15

Melvin F. Jager, 1 Trade Secrets Law § 3:42 ...................................................... 3, 10

Restatement (Third) of Agency § 7.01 ......................................................... 4, 13

Restatement (Third) of Unfair Competition § 45 (1995)............................................ 17

Wash. Rev. Code Ann. § 4.22.030 (West)................................................................. 3, 11

Wash. Rev. Code Ann. § 9A.04.110(12) ...................................................... 19

Wash. Rev. Code Ann. § 19.108.030 (West)..................................................3, 10, 19, 20

**Rules**

Fed. R. Civ. P. 26(a)(1)........................................................................... 21

Fed. R. Civ. P. 37(c)(1)............................................................................. 21

T-Mobile USA, Inc. ("T-Mobile") submits this trial brief regarding its claims for breach of contract and trade secret misappropriation against Huawei Device USA, Inc. ("Huawei USA"). The parties have already submitted extensive summary judgment and motion *in limine* briefing to the Court, and the Court's order on summary judgment establishes the legal framework for T-Mobile's claims against Huawei USA at trial. *See* Dkt. #334 (1/26/17 Order). This trial brief will not rehash the arguments in prior briefing, nor seek to re-litigate issues resolved by the Court's summary judgment order. Instead, this brief focuses on the following issues:

1. Huawei USA's liability for damages caused by its misappropriation of T-Mobile's trade secrets and breaches of contract, including the unjust enrichment gained by Huawei USA and other Huawei entities it acted in concert with and on behalf of during its coordinated scheme;

2. The appropriateness of exemplary damages here, and the proper determination by the jury of whether the misappropriation of T-Mobile's trade secrets by Huawei USA and other Huawei entities was willful and malicious;

3. The exclusion of Huawei USA's late-disclosed witnesses, Jin Zhou and Xuesong Yu, from its trial witness list; and

4. Streamlining the use of foreign-language documents and interpreters at trial.

In the event that Huawei USA raises additional issues in its trial brief, or if there are additional issues on which the Court would like briefing, T-Mobile will respond as requested.

## I.  PRELIMINARY STATEMENT

Huawei USA, acting in concert with and on behalf of its "corporate counterparts" in China, engaged in a conscious and coordinated scheme to steal confidential information about T-Mobile's proprietary robotic testing system ("Tappy"), so that Huawei entities could build its own copycat robot and improve the quality of its devices, including those sold to T-Mobile's competitors. In doing so, Huawei USA willfully and maliciously misappropriated T-Mobile's trade secrets and deliberately violated its nondisclosure and confidentiality agreements with T-Mobile.

The plot to steal T-Mobile's trade secrets was elaborate and involved dozens of employees

from Huawei USA and other Huawei entities in China.[1]   These employees worked hand-in-hand over the course of a year, infiltrating T-Mobile's testing labs without authorization, taking photographs of Tappy, and even removing parts of the robotic testing system from the lab for further analysis.   The trade secrets were transmitted back to Huawei's "HQ" in China, where development of its xDeviceRobot (described by Huawei as the "same robot" as T-Mobile's) was secretly underway.   The goal was explicit—to copy T-Mobile's robot so that it could improve the quality of its devices, thereby increasing sales around the world and decreasing costs of returns.

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████   But rather than accept responsibility for its wrongdoing, Huawei USA is now attempting to leverage the Court's order dismissing Huawei Technologies from this case to shield itself from any liability for "benefits, if any, accruing to foreign sales by other non-party Huawei entities as unjust enrichment to Huawei Device USA."   Dkt. #348 (Joint Pretrial Order) at 5 ("Issue of Law" #6 raised by Huawei USA).

Under Washington law, however, Huawei USA is responsible for all damages caused by its misappropriation of T-Mobile's trade secrets and deliberate breaches of the nondisclosure and confidentiality agreements for at least three reasons.

*First*, the statutory language of Washington's Uniform Trade Secret Act ("WUTSA") is clear—a plaintiff may recover damages for the "actual loss caused by misappropriation" or "unjust enrichment ***caused by misappropriation*** that is not taken into account in computing damages for

---

[1] For the sake of clarity, T-Mobile reserves its right to appeal or seek reconsideration of the Court's summary judgment order dismissing Huawei Technologies. *See* Dkt. #334 (1/26/17 Order).  Given Huawei's admissions during litigation and the Court's summary judgment ruling finding that certain documents, which reference Huawei Technologies, were in fact Huawei Device China documents, T-Mobile references Huawei Device China herein.  At trial, T-Mobile intends to establish that Huawei USA was acting in concert with, on behalf of, and to the benefit of Huawei Device China and Huawei Technologies.

actual loss." Wash. Rev. Code Ann. § 19.108.030 (West) (emphasis added). No qualifiers limit recovery to the defendant's personal or direct financial gain. *See* Melvin F. Jager, 1 Trade Secrets Law § 3:42 ("[D]amages can also include an ***amount for the unjust enrichment of*** either the defendant or ***third parties caused by the defendant's misappropriation*** that is not taken into account in computing actual loss.") (emphasis added). Evidence at trial will show that Huawei USA's misappropriation was the "but for" cause of the unjust enrichment accruing to its "corporate counterparts," including the benefits that Huawei entities obtained through the creation of a copycat testing robot. *See Mangren R&D Corp. v. National Chemical Co.*, 87 F.3d 937, 945-46 (7th Cir. 1995) (affirming award of "unjust enrichment" damages for sales made by third-party, and holding: "[t]he fact that defendants may not have personally benefitted from [third party's] sales is not dispositive . . . so long as defendants' misappropriation was a 'but for' cause of the third party's sales."). The plain language of the statute, and the statutory scheme, governs here. *HomeStreet, Inc. v. State, Dep't. of Revenue*, 166 Wash.2d 444, 452 (2009) ("A statute that is clear on its face is not subject to judicial construction.") (quoting *State v. J.M.*, 144 Wash.2d 472, 480 (2001)) (internal quotations omitted).

***Second***, as a separate basis, Huawei USA is jointly and severally liable for damages stemming from the actions of its joint tortfeasors, including those with whom it was acting in concert or with whom an agency relationship exists. *See* Wash. Rev. Code Ann. § 4.22.030 (West) (joint and several liability statute); *Elliot v. Barnes*, 32 Wash. App. 88, 90-91 (1982) ("Where distinct actors work in concert according to a general plan in committing a single tort they are joint tort-feasors."); *Standing Rock Homeowners Ass'n v. Misich*, 106 Wash. App. 231, 245-47 (2001) (applying Wash. Rev. Code Ann. § 4.22.030 and common law equivalent discussed in *Elliot* in the intentional tort context); *see also Clark v. Bunker*, 453 F.2d 1006, 1010-11 (9th Cir. 1972) (holding joint tortfeasor liable for profits (unjust enrichment) received by another tortfeasor as a result of the misappropriation); *Synergy GreenTech Corp. v. Magna Force, Inc.*, 2016 WL 4198547, *2 (W.D. Wash. Aug. 8, 2016) ("Where the [agent] performs an act or a series of acts which would

amount to [wrongful conduct] if he acted for himself alone, he is personally liable even though the acts were performed for the benefit of his principal and without profit to himself personally.") (quoting *Dodson v. Economy Equip. Co.*, 188 Wash. 340, 343 (1936)).  Whether Huawei USA might be entitled to contribution or indemnity from a joint tortfeasor is a matter it can raise in its own action against one of the other Huawei entities.  It is not T-Mobile's responsibility, as the injured party, to make such deductions from its damages.

*Third*, Huawei USA entered into a nondisclosure agreement with T-Mobile relating to Tappy "on behalf of" its affiliates, parents, and subsidiaries, among others.  Pursuant to the express terms of the agreement, Huawei USA agreed that T-Mobile could hold it "responsible for any breach of this Agreement" by its affiliates or others to whom it disclosed T-Mobile's confidential information.  Moreover, the Master Supply Agreement ("MSA") between the parties expressly provides that, in the event of a "breach of confidentiality or the gross negligence or willful misconduct," Huawei USA can be held liable for "indirect, punitive…, special, consequential or incidental damages" as well as "any other remedies provided at law, equity, statute or this Agreement[.]"  Under the plain terms of the contracts, Huawei USA is responsible for the damages caused by its own breaches as well as the breaches of other Huawei entities, including the unjust enrichment damages gained by Huawei entities due to the unauthorized disclosure of T-Mobile's confidential information.

In sum, T-Mobile will show that Huawei USA is liable for all damages, including actual losses and unjust enrichment, caused by its misappropriation and breaches of contract, including the unjust enrichment of its "corporate counterparts" who benefited from Huawei USA's willful and malicious misconduct.  The fact that Huawei USA used other entities to create windfall profits does not limit its responsibility for those damages.  The issues of exemplary damages, late disclosure of witnesses, and foreign language documents and interpreters are also addressed below.

## II. SUMMARY OF EVIDENCE

### A. T-Mobile's Tappy Testing System Is Unique And Valuable

T-Mobile will show at trial that it developed, at great expense, a unique robotic device testing system that improves the performance of mobile phones by testing how people interact with their devices in the real world. Dkt. #284-1 (Jenkinson Dep.) at 3-5. Tappy, or the Tappy Testing System ("TTS"), contains a proprietary combination of off-the-shelf and custom components and is designed to test up to three weeks of real world usage in a single, 24-hour period. *See* Dkt. #285 (Exhibit 2); Dkt. #285-7 (Exhibit 34, Expert Report of Michael Davies) at ¶ 26. The TTS allows T-Mobile to more easily identify and resolve possible phone problems in advance, leading to higher customer satisfaction and lower device returns. Dkt. #285-7 (Exhibit 34, Expert Report of Michael Davies) at ¶¶ 223-28. The system is specifically designed to test any mobile device, and requires minimal input from the operator to set up a new device for testing. The TTS has enabled T-Mobile to more effectively differentiate itself from its competitors in the market by offering high-quality, low-cost devices. *Id.* at ¶¶ 227-28.

### B. Huawei USA Accessed TTS To Test Devices For T-Mobile Under NDA

T-Mobile used TTS to perform validation testing—a "pass/fail" test for mobile phone manufacturers—for a number of years. Given the incredible success of TTS in that limited context, in 2012, T-Mobile deployed a new testing initiative that allowed several of its trusted business partners (handset suppliers) to directly access and perform tests on the TTS. Because T-Mobile's TTS is a highly confidential and valuable trade secret, T-Mobile employed heightened security measures to protect this information. These protections included, among other things, strict confidentiality obligations in the parties' Master Supply Agreement, the "Clean Room Letter," and the Non-Disclosure Agreement. The agreements make clear that T-Mobile's TTS was highly confidential and should not be disclosed or used by Huawei USA other than as expressly proscribed in the agreements.

**C.    Huawei USA And Huawei Device China Employees Schemed To Steal Trade Secret Information About The TTS**

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████ Understanding

it would not be able to acquire the TTS by legitimate means, Huawei USA and Huawei Device

China employees drew up plans to steal the proprietary information it needed to develop its own

copycat robotic testing system, which it named xDeviceRobot. █████████████████

████████████████████████████████████████████

Unbeknownst to T-Mobile, Huawei's illicit scheme (which included dozens of employees

in both China and the U.S.) was well underway by the time T-Mobile entrusted certain Huawei

USA employees with unescorted badge access to the TTS in September 2012. ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ The evidentiary

record shows that this scheme continued throughout 2012 and into 2013:

- ████████████████████████████████████████
  ████████████████████████████████████████
  █████████████████████████

- ████████████████████████████████████████
  ████████████████████████████████████████
  ███████████████████████████████████



- ███████████████████████████████
  ████████████████

- ███████████████████████████████
  ████████████

- ███████████████████████████████
  █████████

████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

███ Wang secretly entered T-Mobile's robot lab on two separate occasions; T-Mobile caught him and expelled him both times.

███████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████ ████████
████████████████████████████████████████

_____

[2] All citations to Exhibits are references to exhibits attached to the Declaration of Steven N. Feldman in Support of T-Mobile's Trial Brief ("Feldman Decl.").

**D.** **The Evidence Shows Huawei Entities Used T-Mobile's Trade Secrets To Create, And Profit From, Its Own Copycat Robot**

Huawei's testing system – xDeviceRobot – was developed using copied information from TTS, and was used to test a number of devices sold to other international wireless service providers. As Huawei USA's own expert Dr. Wolfe admits, the TTS system could not be replicated from public information.

T-Mobile's evidence shows that Huawei's China-based entities were deeply involved in the decision to steal the robot technology, the selection and collection of information necessary to copy the robot, and the implementation of T-Mobile's trade secrets into Huawei's xDeviceRobot.

[REDACTED]

[REDACTED]

Huawei, as a whole, directly benefited from its use of xDeviceRobot. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] And Huawei tested devices for other, international wireless service providers using the stolen technology. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] Thus, T-Mobile will show that Huawei USA and the other Huawei entities continue to benefit from the misappropriation caused by Huawei USA.

## III.   ARGUMENT

### A.   Huawei USA Is Liable For Damages And All Unjust Enrichment Caused By Its Misappropriation And Breaches Of Contract

In the Joint Pretrial Order (Dkt. #348), Huawei USA signaled that it will seek to avoid responsibility for the unjust enrichment accruing to its "corporate counterparts" and joint

tortfeasors as a direct result of Huawei USA's misappropriation of T-Mobile's trade secrets and breaches of its confidentiality obligations under the nondisclosure agreement. They should not be permitted to do so for at least the reasons set forth below.

### 1. The Jury May Award All Unjust Enrichment Damages Caused By Huawei USA's Misappropriation

Under Washington law, a plaintiff may recover damages for the "actual loss caused by misappropriation" *or* "unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss." Wash. Rev. Code Ann. § 19.108.030 (West). There is no requirement that the defendant alone directly receive all monetary benefits to recover unjust enrichment damages; to the contrary, the plain statutory language allows a plaintiff to recover damages for unjust enrichment **"*caused by misappropriation.*"** *Id.*; *see also HomeStreet, Inc.*, 166 Wash.2d at 451 ("A statute that is clear on its face is not subject to judicial construction.").

It is established that the "unjust enrichment caused by misappropriation" authorized by the trade secrets statute includes the unjust enrichment that accrues to third parties as a result of the misappropriation. *See* Melvin F. Jager, 1 Trade Secrets Law § 3:42 (construing identical provision in Uniform Trade Secrets Act, and noting that "[d]amages can also include an ***amount for the unjust enrichment of*** either the defendant or ***third parties caused by the defendant's misappropriation*** that is not taken into account in computing actual loss.") (emphasis added); *see also McCormack & Dodge Corp. v. ABC Mgmt. Sys., Inc.*, 222 U.S.P.Q. 432, 444 (Wash. Super. Ct. 1983) (holding WUTSA applied to "all acts of misappropriation of or caused by [defendant], its agents, licensees, employees, and those in privity with it"); *Mangren*, 87 F.3d at 945-46 (affirming award of "unjust enrichment" damages for sales made by third-party non-defendant, which were made as a result of the third party's access to the trade secrets).

Given the clear, plain language of WUTSA, this Court need not look further. *HomeStreet, Inc.*, 166 Wash.2d at 451.

## 2. The Jury May Award Damages For The Wrongful Conduct Of Huawei USA And Its Joint Tortfeasors

Even if the language of WUTSA did not clearly allow T-Mobile to recover all unjust enrichment caused by Huawei USA's misappropriation, T Mobile would still be entitled to recover the unjust enrichment accruing to Huawei USA's joint tortfeasors under the well-established principle of joint and several liability. *See, e..g, Standing Rock*, 106 Wash. App. at 245-47 (applying Wash. Rev. Code Ann. § 4.22.030 and common law equivalent discussed in *Elliot* in the intentional tort context). Where joint and several liability applies, a victim of trade secret misappropriation can sue any joint tortfeasor and "recover his entire damages from that tortfeasor." *See Salton, Inc. v. Philips Domestic Appliances & Pers. Care B.V.*, 391 F.3d 871, 877 (7th Cir. 2005) (explaining that while "[t]he defendant may have a right to contribution (i.e., to a sharing of the pain) from the other tortfeasors, …the victim is not required to sue more than one of his oppressors"). The fact that other entities may have contributed to a trade secret plaintiff's injuries does not lessen a defendant's liability; nor is a plaintiff required to sue all potential joint tortfeasors to recover damages for their conduct.[3] *See Oculus Innovative Scis., Inc. v. Nofil Corp.*, No. C 06-01686 SI, 2007 WL 205068, at *2 (N.D. Cal. Jan. 25, 2007) (not necessary for all joint tortfeasors to be named as defendants in action for misappropriation); *Salton*, 391 F.3d at 877 (same).

Thus, a joint tortfeasor is liable for the full amount of the damages caused by the wrongful acts, including the unjust enrichment received by another tortfeasor. *See Clark*, 453 F.2d at 1010-11 (holding joint tortfeasor liable for profits (unjust enrichment) received by another tortfeasor as a result of the misappropriation); *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1381 (Cal. Ct. App. 2000) ("[A]ll persons who are shown to have participated in an intentional tort are liable for

---

[3] Washington law permits a plaintiff to recover ***all*** damages stemming from the conduct of joint tortfeasors, even when a tortfeasor is not a party to the action. *See Standing Rock*, 106 Wash. App. at 245-47 (defendant found jointly and severally liable for intentional property destruction by non-parties); *see also Gass v. McPherson's Inc. Realtors*, 79 Wash. App. 65, 70 (1995) ("[J]oint liability can arise between a party and a nonparty . . . ."). Indeed, as here, "[w]here liability was joint and several, each tortfeasor was liable for the entire harm and the injured party could sue one or all of the tortfeasors to obtain a full recovery." *Washburn v. Beatt Equip. Co.*, 120 Wash. 2d 246, 291 (1992).

the full amount the damages suffered," even if defendant did not personally benefit or use the misappropriated trade secrets.).

Where, as here, "distinct actors work in concert according to a general plan in committing a single tort[,] they are joint tortfeasors." *Elliot*, 32 Wash. App. at 90-91; *see also Standing Rock*, 106 Wash. App. at 245-247 (finding defendant liable as a joint tortfeasor where it acted "(1) in concert with others, (2) with unity of purpose, and (3) with the knowledge and consent of other actors to [commit the intentional tort]"). A finding that two entities "act[ed] in concert" merely requires "proof that the actors consciously acted together in an unlawful manner[.]" *See* 16 Wash. Prac., Tort Law And Practice § 13:11 (4th ed.).

As described above, the evidence shows Huawei USA, acting in concert with other Huawei entities, engaged in a year-long scheme to steal T-Mobile's trade secret information. ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████    ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

The existence of an agency relationship provides an additional vehicle to hold Huawei USA responsible for the unjust enrichment accruing to its "corporate counterparts." An express or implied agency relationship may exist "when one party acts at the instance of and, in some material degree, under the direction and control of another." *CKP, Inc. v. GRS Constr. Co.*, 63 Wash. App. 601, 607 (1991) (citing *Hewson Constr., Inc. v. Reintree Corp.*, 101 Wash.2d 819, 823 (1984)). "Where the [agent] performs an act or a series of acts which would amount to [wrongful conduct] if he acted for himself alone, *he is personally liable even though the acts were*

*performed for the benefit of his principal and without profit to himself personally.*" *Synergy*,

2016 WL 4198547, *2 (emphasis added); *see also* Restatement (Third) of Agency § 7.01, Cmt. b

("It is also immaterial to an agent's tort liability to a third party whether the agent benefitted

personally from the tortious conduct.").[4] T-Mobile intends to show at trial that Huawei USA acted

under the direction of controlling Huawei entities in China. Indeed, the evidence shows Huawei

"HQ" instructed Huawei USA to steal the robot technology, directed the selection and collection

of information necessary to copy the robot, and ultimately—with Huawei USA's assistance—

implemented T-Mobile's trade secrets into xDeviceRobot for the benefit of all Huawei entities.[5]

In sum, the evidence will show that Huawei USA acted in concert with, on behalf of, and

to the benefit of other Huawei entities in a common scheme to steal T-Mobile's trade secret

information for the specific purpose of improving Huawei's testing capabilities and facilities in

China. And that is what happened. Indeed, Huawei's unjust enrichment as a result of this

coordinated theft is significant. T-Mobile's trade secrets were incorporated into a competing

[4] T-Mobile has maintained its positions on conspiracy, agency and alter ego since the outset of this litigation. *See* Dkt. #1 (Compl.) at ¶ 26 ("T-Mobile is informed and believes, and based thereon alleges, that at all times mentioned herein, each of the Defendants was the agent, servant and employee, co-venturer, alter ego, and co-conspirator of the other, and was at all times herein mentioned[.]"); *see also, e.g., id.* at ¶¶ 17, 57-58 (describing coordinated theft and involvement by Huawei employees across several entities); Dkt. #37 (T-Mobile's Opposition to Huawei USA MTD) at 5 ("T-Mobile alleges that Huawei engaged in a *campaign* and conspiracy to copy T-Mobile's technology in order to build and refine its own testing robot.").

[5] Huawei USA is also subject to joint and several liability under an alter ego/instrumentality theory. *Becker Family Builders Co-Plaintiffs Grp. v. F.D.I.C.*, No. C09-5477RJB, 2010 WL 3672352, at *3 (W.D. Wash. Sept. 14, 2010) ("Under … the 'alter ego theory,' the corporate veil may be pierced where 'the corporate entity has been disregarded by the principals themselves so that there is such a unity of ownership and interest that the separateness of the corporation has ceased to exist.'") (citation omitted). Here, the evidence shows Huawei's disregard of corporate formalities, demonstrated in part by the contradictory and misleading positions taken during this litigation regarding the role played by its corporate entities and evidence showing a unity of interest and ownership among the relevant Huawei entities. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Indeed, as one example of the blurred lines among Huawei entities (there are many), Huawei Technologies and Huawei Device China have respectively claimed the same set of sales data as their own. For example, in Huawei Technologies' interrogatory response, it cited a set of financial data in answering T-Mobile's interrogatory asking Huawei Technologies to identify its revenues, profits, and other financial information. Ex. M (2016-04-18 Huawei Technologies' Interrogatory Responses). ████████████████████████████████████████████████████████████████████████████████

robotic testing system, the xDevice Robot, which greatly improved Huawei's testing capabilities. *See* Dkt. #285-7 (Exhibit 34, Expert Report of Michael Davies) at ¶¶ 30-35, ¶¶ 283-319. ██████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████ Thus, Huawei is jointly and severally liable for the misappropriation of T-Mobile's trade secrets, including the unjust enrichment of its joint tortfeasors. *See Allied Erecting & Dismantling Co. v. Genesis Equip. & Manufac., Inc.*, 511 Fed. Appx. 398, 400-02 (6th Cir. 2013) (affirming jury finding that defendants were jointly and severally liable for misappropriation and award of $3,046,800 in unjust enrichment damages under Ohio UTSA); *Clark*, 453 F.2d at 1010-11 ("[A]ppellants' first argument is that no award of compensatory damages could be made against appellants other than Memorial Guardian Plans, Inc., because no other appellant was shown to have received any profits [unjust enrichment] from the misappropriation and use of appellee's plan. It is sufficient to say that the trial court found appellants to be joint tortfeasors and hence jointly and severally liable for the damage sustained by appellee, and the record supports that finding.").

### 3.  Huawei USA Is Liable For Its Affiliates' Breaches

T-Mobile is also entitled to recover the unjust enrichment damages caused by breach of its contracts with Huawei USA, whether by Huawei USA or its affiliates. It is undisputed that Huawei USA signed the nondisclosure agreement on behalf of its affiliates, including the other Huawei entities, and expressly agreed that it would be "responsible" for any breaches by these affiliates. Moreover, the MSA provides that, in the event of a "breach of confidentiality or the gross negligence or willful misconduct" by Huawei USA, Huawei USA can be held liable for "indirect, punitive…, special, consequential or incidental damages[,]" as well as "any other remedies provided at law, equity, statute or this Agreement[.]" Ex. O (MSA) at §§ 4.3, 9.4.4.

Both New York and Washington law permit recovery of unjust enrichment for breach of contract. *See, e.g., Summit Prop. Int'l, LLC v. Ladies Prof. Golf Ass'n*, 2010 WL 4983179, at *3-

4 (S.D.N.Y. Dec. 6, 2010) ("[R]estitution damages are available as an equitable remedy for repudiation or total breach of a contract."); *Y.J.D Rest. Supply Co. v. DIB*, 413 N.Y.S.2d 835, 836 (Sup. Ct. 1979) (although damages could not be proven, restitution damages awarded for breach of non-competition agreement because the defendant should not be enriched by his own willful and wrongful acts); *Veritas Operating Corp. v. Microsoft Corp.*, No. C06-0703-JCC, 2008 WL 7404617, at *4 (W.D. Wash. Feb. 26, 2008) (recognizing that "[r]estitution is an alternative remedy to damages for breach of contract," and holding that "to the extent that [expert's] calculations of contract-related damages is based on unjust enrichment, his testimony on the subject should be admissible"); 25 Wash. Prac., Contract Law And Practice § 14:7 (3d ed.) (same); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 39(1) (disgorgement of profits available for deliberate breach of contract).

### 4.     The Jury May Award A Reasonable Royalty

Under Washington law, a reasonable royalty measure has "long been one of a number of calculations available to measure damages for trade secret misappropriation, particularly the value of the benefit received by a defendant who misappropriates trade secrets." *Veritas*, 2008 WL 7404617, at *2 (internal quotations omitted); *see also id.* at *3 (providing that reasonable royalty is also an appropriate measure for breach of contract). In fashioning a reasonable royalty, "most courts adjust the measure of damages to accord with the commercial setting of the injury, the likely future consequences of the misappropriation, and the nature and extent of the use the defendant put the trade secret to after misappropriation." *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974). To approximate the parties' agreement, had they bargained in good faith at the time of the misappropriation, the trier of fact should consider:

> the resulting and foreseeable changes in the parties' competitive posture; the prices past purchasers or licensees may have paid; the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business; the nature and extent of the use the defendant intended for the secret; and finally whatever other unique factors in the particular case which might have affected the parties' agreement[.]

*Id.* at 539. Even though both parties have interests they wish to protect, "the law is far more

concerned with the rights and interests of the aggrieved plaintiff than in the interests of the defendants which they would have tried to protect had they dealt openly with the plaintiff from the beginning." *Id*. at 544.

Reasonable royalty damages are not limited to the defendant's personal commercial use; instead, these damages can compensate for the unauthorized disclosure of trade secret information by defendant to *third parties*. *See Storagecraft Tech. Corp. v. Kirby*, 744 F.3d 1183, 1185 (10th Cir. 2014) (affirming jury verdict for a reasonable royalty award on the basis that defendant disclosed the trade secret to a third party, even though the defendant "never used the secret for his own personal profit"). Indeed, "[w]hen someone steals a trade secret and discloses it to a competitor[,] [the misappropriator] effectively assumes . . . an unrestricted license in the trade secret. And that bears its costs. After all, what value does a trade secret hold when it's no longer a secret from the trade?" *Id.*; *see also id.* at 1189 (nothing in the Utah Trade Secret Act—which is identical to the Uniform Trade Secret Act, the model for Washington's statute—restricted the availability of "reasonable royalty" damages to cases in which the misappropriator used a trade secret commercially, rather than disclosed it to others). Thus, it is proper for the jury, in assessing a reasonable royalty, to consider the use of T-Mobile's trade secrets by other Huawei entities that improperly received the information from Huawei USA. *See id.* at 1189-90.

Where, as here, Huawei USA claims to have not made any profits from misappropriation, a reasonable royalty measure of damages would be particularly appropriate. *See, e.g.*, *University Computing*, 504 F.2d at 536 ("[T]he lack of actual profits does not insulate the defendants from being obliged to pay for what they have wrongfully obtained."); *LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 186–87 (S.D.N.Y. 2002) ("[R]easonable royalty is the best measure of damages in a case where the alleged thief made no profits."). The rationale is simple: "the risk of defendants[] . . . using the misappropriated secret[] should not be placed on the injured plaintiff, but rather the defendants must bear the risk . . . ." *University Computing*, 504 F.2d at 536. A reasonable royalty, therefore, "avoids the danger of an inadequate measure of damages by enabling

the jury to consider various relevant factors to reach the most practical and sensible award." *LinkCo, Inc.*, 232 F. Supp. 2d at 186; *see also* Restatement (Third) of Unfair Competition § 45 (1995) ("[I]n cases in which the defendant's gain from the trade secret is difficult to measure . . . , a reasonable royalty may be the best means of approximating the defendant's unjust enrichment.").

At trial, T-Mobile will present expert testimony—as an alternate measure of unjust enrichment—regarding the calculation of a lump-sum royalty based on a hypothetical negotiation between T-Mobile and Huawei. Consistent with the *Georgia-Pacific* factors, T-Mobile's damages expert, Dr. Ryan Sullivan, analyzed a hypothetical negotiation between the parties in May 2013, when the final acts of misappropriation occurred. Dr. Sullivan considered, among other things, the resulting and foreseeable changes in the parties' competitive posture; past and comparable licenses for the technology; the total value of the secret to T-Mobile; the nature and extent of the use by Huawei entities; the commercial setting of the injury; the likely future consequences of the misappropriation; and other factors under the *Georgia-Pacific* test.

One of the key considerations in a reasonable royalty negotiation is the scope of the license the defendant assumed for itself as to the technology at issue. *See Storagecraft*, 744 F.3d at 1189 ("[W]e don't doubt the breadth of a trade secret license can have a significant effect on price. . . . No one doubts that a trade secret holder and licensee might agree to one price for a highly restrictive license and an entirely different price for an unrestricted license in the very same secret. For this reason, it is surely important when setting a reasonable royalty award to account for the scope of the license the defendant assumed for himself, to aim at a price that reflects the particular 'use of the trade secret made by the defendant.'"). Thus, the evidence detailing the use of T-Mobile's Tappy technology by Huawei USA, including by non-parties, is highly relevant in a hypothetical negotiation. *See id.* at 1189 ("[I]it is surely important when setting a reasonable royalty award to account for the scope of the license the defendant assumed for himself, to aim at a price that reflects the particular 'use of the trade secret made by the defendant.' At least in this very broad sense of the word, then, the nature of the defendant's 'use' of the trade secret matters

a great deal in the reasonable royalty analysis.") (internal citations omitted).  Indeed, Huawei USA's unauthorized disclosure of T-Mobile's trade secrets to other Huawei entities informs the broad, and non-exclusive, scope of the hypothetical license.  *See id.* at 1189-90 ("the license [defendant] assumed allowed him the right to share the trade secret with a rival and permit (if not compel) its commercial exploitation by that rival, leaving the remaining financial value of the (former) secret seriously compromised.").

Further, it is typical practice in licensing negotiations to account for an affiliate's need to use the license and benefits to the affiliate from that license.  *See, e.g.*, *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 425 F.3d 1366, 1377 (Fed. Cir. 2005) ("[T]the holding company would not enter any negotiation without considering the competitive position of its corporate parent, Union Carbide Corporation. . . .  Therefore any hypothetical negotiation with the holding company must necessarily include the reality that the economic impact on the Union Carbide Corporation would weigh heavily in all decisions.")*, overruled on other grounds by Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348 (Fed. Cir. 2009); *Inventio AG v. Thyssenkrupp Elevator Am. Corp.*, 2013 WL 6628007, at *1 (D. Del. Dec. 13, 2013) ("As there is a 'genuine relationship between these companies,' the financial impact on the companies is a proper factor for the expert to consider.") (quoting *Union Carbide Chems. & Plastics Co.*, 425 F.3d at 1378).  Therefore, it is appropriate here to account for the use of the license by other Huawei entities, particularly given that Huawei USA shares and uses manufacturing and testing facilities with them, and Huawei Device China has demonstrated a need for the technology (as evidenced by its repeated requests for confidential information and ultimate use of the technology).

In sum, "the *amount* of reasonable royalty damages [Huawei USA] must pay undoubtedly depends on what [it] did with the secret—what uses [it] made of it," including the benefits caused by its unauthorized disclosure to the other Huawei entities.  *See Storagecraft*, 744 F.3d at 1189.

**B.    The Court Should Award Exemplary Damages To T-Mobile**

Under Washington law, the Court is entitled to award exemplary damages (up to twice the amount of trade secrets damages awarded) and attorney's fees if "willful and malicious misappropriation exists." Wash. Rev. Code Ann. § 19.108.030(2) (West). The unauthorized use and disclosure of T-Mobile's trade secrets by Huawei USA and the other Huawei entities constitutes "willful and malicious" acts of misappropriation.

"Willful and malicious" misappropriation is defined as "intentional misappropriation as well as a misappropriation resulting from the conscious disregard of the rights of another." *Mangren,* 87 F.3d at 946; *see also* Wash. Rev. Code Ann. § 9A.04.110(12) ("Malice may be inferred from an act done in willful disregard of the rights of another"); *Boeing Co. v. Sierracin Corp.,* 108 Wn.2d 38, 62-64 (1987) (applying a knowing and intentional standard).

Here, there is ample evidence that Huawei USA's misappropriation was willful and malicious. Huawei USA intentionally and consciously disregarded the rights of T-Mobile despite the strict confidentiality obligations that Huawei USA agreed to in its contracts with T-Mobile. Among other things, employees of Huawei USA and its affiliates infiltrated T-Mobile's testing labs without authorization; took photographs of Tappy's design and construction; stole parts of T-Mobile's robotic testing system; and then provided that stolen information to other Huawei entities so that they could develop their own testing robot. Further, after T-Mobile discovered Huawei USA's wrongful conduct, it attempted to cover up both the extent of the theft and deflect blame. ████████████████████████████████████████████████████ ███████████████████████████████████████  ███████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████  Yet the evidentiary record here shows that more than forty employees from both Huawei USA and Huawei Device China and Technologies participated in this clandestine scheme that lasted more than a year. The sham investigation and resulting so-called disciplinary actions, and repeated efforts over

the many months that followed to persuade T-Mobile that Huawei corporate entities had nothing to do with the theft of robot parts were all part of an effort to cover up the scheme to steal and copy T-Mobile's testing system.

While authority rests with the Court to award punitive damages following the jury's findings (Wash. Rev. Code Ann. § 19.108.030(2)), the question of whether the misappropriation by Huawei USA and the other Huawei entities was willful and malicious, and thus, whether T-Mobile is entitled to punitive damages, is a question for the jury. *See, e.g.*, Verdict at 4, *Straitshot Comms, Inc. v. Telekenex, Inc.*, No. 2:10-cv-00268-TSZ (W.D. Wash. Feb. 6, 2012) (willful and malicious instruction presented to jury in context of trade secrets claim); Special Verdict Form at 4, *Ultimate Timing, L.L.C. v. Simms*, No. 2:08-cv-01632-MJP (W.D. Wash. July 2, 2010) (same); Verdict Form at 2, *F&G Scrolling Mouse, L.L.C. v. Key Tronic Corp.*, No. 2:99-cv-00995-JCC (W.D. Wash. Dec. 20, 2001) (same). Because the jury will already be considering the extent, willfulness, and maliciousness of Huawei USA's conduct, T-Mobile suggests that the jury be asked to issue an advisory award on the amount of punitive damages in the event it finds liability and willfulness.

### C. Estoppel Is Not A Valid Defense To Misappropriation

In the Joint Pretrial Order, Huawei USA asserts, "T-Mobile is estopped from making the claims set forth in its Complaint." Dkt # 348. However, estoppel is an equitable defense; it is not available for claims for intentional torts, such as trade secret misappropriation. *See, e.g.*, *Wyeth v. Nat. Biologics, Inc.*, 2003 WL 22282371, at *25 (D. Minn. Oct. 2, 2003), *aff'd*, 395 F.3d 897 (8th Cir. 2005) ("The equitable defense of estoppel does not apply to Wyeth's claim against Natural Biologics for trade secret misappropriation.").

## IV. REMAINING ISSUES REQUIRING ACTION BY THE COURT

### A. The Court Should Exclude Huawei USA's Late-Disclosed Witnesses

T-Mobile objects to Huawei USA's two late-disclosed witnesses, Jin Zhou and Xuesong Yu, on its witness list. T-Mobile's Motion to Exclude these witnesses, which was made

telephonically pursuant to Local Rule 7(i), on January 24, 2017, is currently pending.[6]

"The purpose of Rule 26 disclosures is to identify those witnesses that a party intends to use at trial." *Vieste, LLC v. Hill Redwood Dev.*, 2011 WL 2181200, at *3 (N.D. Cal. June 3, 2011). In that vein, Rule 26 requires that initial disclosures identify "each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1). "This enables the opposing party to plan its discovery, including depositions, based on the disclosures." *Vieste*, 2011 WL 2181200, at *3. As a result, failure to comply with Rule 26 means that witness is barred from supplying evidence at a trial "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Jin Zhou and Xuesong Yu were not identified by either party as a witness—by name or topic of testimony—in the initial or supplemental Rule 26 disclosures. Nor has either person been deposed during this litigation. Instead, Huawei USA claims that including the names of Jin Zhou and Xuesong Yu in an interrogatory response is sufficient to comply with its Rule 26(a)(1) disclosure requirements. It is not. The mere inclusion of a name in an interrogatory response as having discoverable information does not meet a party's Rule 26(a)(1)(A)(i) obligations. In *Benjamin v. B&H Education, Inc.*, the district court struck a declaration from a potential witness whose name was included "in response to interrogatories," but who was "never included . . . in their Rule 26 disclosure" and "never identified . . . as a potential witness for the plaintiffs." 2015 WL 6164891, at *2 (N.D. Cal. Oct. 16, 2015). The court held unambiguously, "'The mere mention of a name in a deposition or interrogatory response is insufficient to satisfy Rule 26(a)(1)(A)(i).'" *Id.* (citation omitted). Indeed, Huawei USA never identified Jin Zhou or Xuesong Yu as potential trial witnesses during discovery, but rather just as individuals who may have discoverable

---

[6] T-Mobile further objects to the last-second inclusion of non-party Hans Kuosmanen of OptoFidelity—someone who did not appear in Huawei USA's original pretrial statement exchanged pursuant to L.R. 16, and someone never deposed in this case. As the Court is aware, a request made by counsel for OptoFidelity, seeking to confirm that non-party OptoFidelity no longer needs to provide discovery served by Huawei in January of 2016, is currently pending before the Court. The parties submitted their positions to the Court's Courtroom Deputy on January 27.

information.  Such a disclosure is plainly insufficient to comply with the intentions of Rule 26(a)(1)(A)(i).  *See F.T.C. v. AMG Servs., Inc.*, 2014 WL 317781, at *10 (D. Nev. Jan. 28, 2014) ("[A] party's initial disclosure obligations are not satisfied by disclosing individuals who are 'likely to have discoverable information . . . [but whom] the disclosing party may use to support its claims.'") (citation omitted).

Huawei does not offer any justification for the late-disclosure of these witnesses.  Exclusion is therefore necessary to prevent prejudice to T-Mobile.  *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 863 (9th Cir. 2014) ("The last thing a party or its counsel wants in a hotly contested lawsuit is to make last-minute preparations and decisions on the run. The late disclosures here were not harmless.").  The fact that Huawei belatedly – in just the last few days – offered to make Jin Zhou available for deposition on February 9, 2017 does not cure the significant prejudice to T-Mobile.  Indeed, it magnifies it; T-Mobile is actively preparing for trial and would have to cease its preparation to take a deposition of a late-disclosed witness during that time.  *See Ollier*, 768 F.3d at 863 (late disclosure of witnesses was not harmless).  Accordingly, Jin Zhou and Xuesong Yu should be precluded from testifying at trial.

## B.    Use Of Foreign-Language Documents Should Be Streamlined

During trial, T-Mobile intends to offer numerous English translations of foreign-language documents into evidence.  Certified translations of all of the foreign-language documents appearing on T-Mobile's trial exhibit list have been provided to Huawei USA and have been available since January 23, 2017.  Likewise, Huawei USA has listed numerous foreign-language documents on its exhibit list and provided certified translations to T-Mobile on January 31, 2017. The parties expect to meet and confer on objections to the other's certified translations in the coming days and hope to stipulate to the accuracy of most certified translation well before trial. However, in the interest of streamlining the use of foreign-language documents at trial T-Mobile respectfully requests that the Court order the parties either: (i) to stipulate to the accuracy of the other party's certified translations on its trial exhibits; or (ii) to identify the party's specific

objections to the other's certified translations and attempt to resolve any related translation issues through the meet-and-confer process by February 17, 2017. In the alternative, T-Mobile requests that this Court appoint a neutral translator to address any remaining disputes about the translation of documents to the extent that objections remain after the meet-and-confer process.

The Court is well within its discretion to enter such an order, which would be entirely consistent with what other courts have encouraged and directed when managing translation disputes. *See, e.g.*, *United States v. Franco*, 136 F.3d 622, 626 (9th Cir. 1998) (noting district court's order to parties to work together to stipulate to translations and submit competing translations of disputed passages); *accord United States v. Font-Ramirez*, 944 F.2d 42, 47 (1st Cir. 1991) (noting that for an audiotape transcript translated into English, "it is advisable for the trial judge to obtain a stipulated transcript"); *United States v. Onori*, 535 F.2d 938, 947-48 (5th Cir. 1976) (explaining first step is to attempt to stipulate to a unified version before trial).

This Court should preclude the parties from calling into question the accuracy of certified foreign-language document translations unless the parties have identified before trial—with particularity and specificity—the particular words or sentences they dispute and has engaged in a good faith attempt to resolve the issues. *See United States v. Fuentes-Montijo*, 68 F.3d 352, 355 (9th Cir. 1995) (rejecting defendant's argument of error based on "largely conclusory allegations of possible inaccuracy"); *Font-Ramirez*, 944 F.2d at 49 ("In failing to submit an alternative transcript or to raise specific objections, [the defendant] lost the opportunity to effectively contest its admission."). It would not only be unfairly prejudicial to have the status of so many translations unresolved before trial, but it also will impede the efficient functioning of the trial if disputes arise on an *ad hoc* basis and unnecessarily interrupt the presentation of evidence. Such disputes can likely be avoided if is the parties are required to attempt to resolve them before trial, either through a meet-and-confer process and/or the use of a court-appointed, neutral translator.

**C.** ***Ex Parte* Discussions With Court Interpreter Should Not Be Permitted**

Huawei has informed T-Mobile that some of Huawei's trial witnesses will testify in Chinese. T-Mobile has proposed that the parties select a neutral court-certified interpreter for trial, with the understanding that each party may bring an additional check interpreter for any potential disputes. But Huawei rejected T-Mobile's proposal and insists on having its own interpreter serve as the trial interpreter *and* having the right to communicate with that trial interpreter *ex parte* before and during trial. Ex. N (Email from X. Morrow to M. Kammerud). This is unacceptable. Another district court facing this exact situation disqualified a trial interpreter due to the "appearance of impropriety as to impartiality and conflict of interest" arising from the interpreter's prior work with defense counsel. *Advanced Tech. Incubator, Inc. v. Sharp Corp.*, 701 F. Supp. 2d 861, 862–63 (E.D. Tex. 2010). The Court should order the parties to agree to the selection of a neutral, court-certified interpreter, or at least prohibit the trial interpreter's ex parte contact with witnesses and counsel.

DATED this 7th day of February, 2017.

*/s/ Alison L. Plessman*
John C. Hueston (admitted *pro hac vice*)
Alison L. Plessman (admitted *pro hac vice*)
Steven N. Feldman (admitted *pro hac vice*)
jhueston@hueston.com
aplessman@hueston.com
sfeldman@hueston.com
**HUESTON HENNIGAN LLP**
523 W. 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340

*s/ Michael E. Kipling*
Michael E. Kipling, WSBA #7677
kipling@kiplinglawgroup.com
**KIPLING LAW GROUP PLLC**
4464 Fremont Avenue N., Suite 300
Seattle, WA 98103
(206) 545-0345

***Counsel for Plaintiff T-Mobile USA, Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of February, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

DATED this 7th day of February, 2017.

_s/ Xinlin Li Morrow_
Xinlin Li Morrow (admitted *pro hac vice*)
**HUESTON HENNIGAN LLP**
523 W. 6th Street, Suite 400
Los Angeles, CA  90014
(213) 788-4340

*Counsel Plaintiff T-Mobile USA, Inc.*